**SHINDOLLAR et al., Appellees,**

v.

**ERIE INSURANCE COMPANY, Appellant.**

[Cite as *Shindollar v. Erie Ins. Co.,* 148 Ohio App.3d 537, 2002-Ohio-2971.]

Court of Appeals of Ohio,
Third District, Auglaize County.

No. 2–01–35.

Decided June 14, 2002.

538

John F. Moul, for appellees.

Robert B. Fitzgerald and Janet L. Miggins, for appellant.

WALTERS, Judge.

{¶ 1}  Appellant, Erie Insurance Company ("Erie"), brings this appeal from an Auglaize County Common Pleas Court judgment granting summary judgment in favor of appellees, Sarah, David, and Margaret Shindollar, in a declaratory judgment action seeking a determination as to their rights to uninsured and underinsured motorist coverage under automobile liability and personal catastrophe policies issued by Erie.  Erie argues that, as an insurance agent charged with the duty of understanding and explaining available coverages to his customers, David Shindollar should be treated as a special class of insureds and exempted from the mandates of R.C. 3937.18(C).  We find, based upon the Ohio Supreme Court's interpretation of R.C. 3937.18(C), that extrinsic evidence of

David Shindollar's knowledge and experience is inadmissible for purposes of establishing the adequacy of Erie's offer of uninsured and underinsured motorist coverage or that such coverage was knowingly and expressly waived. Furthermore, because the policies herein fail to incorporate elements essential for a meaningful offer, we affirm the judgment of the trial court.

{¶ 2}  Facts and procedural history relevant to the issues raised on appeal are as follows.  On December 31, 1998, David Shindollar's daughter, Sarah, was seriously injured while a passenger in a motor vehicle.  The negligent tortfeasor's insurer, State Farm Insurance, paid Sarah the policy's $100,000 per-person liability coverage limit.

{¶ 3}  At the time of the accident, Sarah Shindollar was a minor and resided with her parents.  The Shindollar family was insured under two policies issued by Erie: a $250,000 per-person and $500,000 per-accident automobile liability policy with uninsured and underinsured ("UM/UIM") coverage selected at lower limits of $100,000 per person and $300,000 per accident;  and a $1,000,000 personal catastrophe policy with a signed UM/UIM rejection form.  Appellees submitted UM/UIM claims under the foregoing policies.  Erie declined coverage, contending that UM/UIM coverage was not available under the personal catastrophe policy and that recovery under the automobile policy was precluded due to the $100,000 limit.  Appellees received from the tortfeasor's insurance provider, which was set off from the policy's $100,000 per-person coverage limits.

{¶ 4}  In January 2001, appellees filed a declaratory judgment action seeking a determination as to their rights to UM/UIM coverage under the Erie policies. Thereafter, both sides moved for summary judgment.  Appellees claimed that they were entitled to additional UM/UIM coverage and compensation under the policies as a matter of law, arguing that the offers and rejections of UM/UIM coverage contained therein were deficient and that UM/UIM coverage should be implied up to the liability limits of each policy.  Erie argued that the offer and rejections contained therein were adequate and that the rejections were knowing and voluntary, citing the fact that David Shindollar was an insurance agent who understood UM/UIM coverage and had participated in the execution of the automobile policy.

{¶ 5}  On November 13, 2001, the trial court granted appellees' motion, finding that the limited rejection in the automobile policy and the rejection form addressing the personal catastrophe policy were invalid and that UM/UIM coverage would therefore be implied in the amount of the underlying liability limits of each policy.  The instant appeal followed, with Erie presenting a single assignment of error for our consideration.

{¶ 6}  For its assignment of error, Erie argues that the trial court erred in granting summary judgment "where the insured was an insurance agent and it

was discernible from the four corners of the insuring agreements that the insured had knowingly and expressly selected lower UM/UIM coverage on the automobile liability policy and had expressly rejected UM/UIM coverage on an umbrella policy."

{¶ 7} Summary judgment is appropriate when, looking at the evidence as a whole, the record demonstrates (1) that no genuine issue of material fact remains to be litigated; (2) that the moving party is entitled to judgment as a matter of law, and; (3) that, after construing the evidence most strongly in the nonmovant's favor, reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made.[1] In ruling on a summary judgment motion, the trial court is not permitted to weigh evidence or choose among reasonable inferences; rather, the court must evaluate evidence, taking all permissible inferences and resolving questions of credibility in favor of the nonmovant.[2] Appellate review of summary judgment determinations is conducted de novo.[3] Accordingly, this court considers the motion independently and without deference to the trial court's findings.[4]

{¶ 8} Pursuant to R.C. 3937.18(A), all insurance companies are required to offer UM/UIM coverage with every automobile liability or motor vehicle liability policy delivered or issued for delivery in Ohio. Every policy must have two-year guarantee periods during which the policy cannot be altered except by agreement of the parties.[5] The commencement of each new policy period mandated by R.C. 3937.31(A) brings into existence a new contract of automobile insurance, whether the policy is categorized as a new policy of insurance or a renewal of an existing policy.[6] The statutory law in effect on the date of each "new" policy is the law to be applied.[7]

{¶ 9} The automobile policy herein was initiated on June 27, 1985. Counting successive two-year policy periods therefrom, the last renewal was June 27, 1997, prior to the September 3, 1997 effective date of the 1997 amendments to

1. Civ.R. 56(C); *Horton v. Harwick Chem. Corp.* (1995), 73 Ohio St.3d 679, 686–687, 653 N.E.2d 1196.

2. *Jacobs v. Racevskis* (1995), 105 Ohio App.3d 1, 7, 663 N.E.2d 653.

3. *Griner v. Minster Bd. of Edn.* (1998), 128 Ohio App.3d 425, 430, 715 N.E.2d 226.

4. *J.A. Industries, Inc. v. All Am. Plastics, Inc.* (1999), 133 Ohio App.3d 76, 82, 726 N.E.2d 1066.

5. *Wolfe v. Wolfe* (2000), 88 Ohio St.3d 246, 250, 725 N.E.2d 261; R.C. 3937.31(A).

6. Id.

7. Id., citing *Ross v. Farmers Ins. Group* (1998), 82 Ohio St.3d 281, 287, 695 N.E.2d 732.

R.C. 3937.18.[8]  Accordingly, that is the version of the law that governs the automobile policy.  In contrast, issues arose as to whether the personal catastrophe policy's last renewal preceded the 1997 amendments.  Although there has been disagreement as to the effect of the amendments on the requirements for valid written offers of UM/UIM coverage as set forth by the Ohio Supreme Court in *Gyori v. Johnston Coca–Cola Bottling Group, Inc.*, [9] and *Linko v. Indemn. Ins. Co. of N. Am.*,[10] we find the following passage from the Sixth District's pronouncement in *Raymond v. Sentry Insurance*[11] to be persuasive and conclude that the 1997 amendments did not alter *Linko's* requirements for a valid offer of UM/UIM coverage:

{¶ 10}  "The trial court concluded that in enacting the amendment, the General Assembly intended to reject *Gyori* except for the portion that it adopted or modified (rejection must be in writing, but need not be executed prior to the effective date of the policy) and, by creating a presumption of a valid offer from a written rejection, eliminate all of the *Linko* requirements.

{¶ 11}  "The trial court is correct with respect to *Gyori*.  The Legislature clearly considered that case and acted to accept that a rejection of UM/UIM coverage must be in writing and, tacitly by its creation of a presumption, that there must be an offer of coverage.  The General Assembly deleted the *Gyori* requirement that the coverage rejection must come prior to the effective date of the policy.

{¶ 12}  "However, the General Assembly could not have intended to directly negate the holding of *Linko* if for no other reason than that the amendment at issue predates *Linko* by three years.  [FN3] Consequently, even after the 1997 amendment, there is vitality to the *Linko* requirements.  *Pillo v. Stricklin* (Dec. 31, 2001), Stark App. No. 2001CA00204, [2002-Ohio-363, 2001 WL 1744148].

{¶ 13}  "FN3.  Additionally, the legislature specifically addresses *Linko* in a 2001 amendment to R.C. 3937.18.  2001 Am.Sub.S.B. 97, Sec. 3, uncodified." [12]

---

8.  In 1997, the General Assembly amended R.C. 3937.18(C) with 1997 Am.Sub.H.B. No. 261, effective September 3, 1997.  The statute has subsequently twice been amended.  2000 Am.Sub.S.B. No. 267, effective September 21, 2000, and 2001 Am.Sub.S.B. No. 97, effective October 31, 2001.

9.  *Gyori v. Johnston Coca–Cola Bottling Group, Inc.* (1996), 76 Ohio St.3d 565, 669 N.E.2d 824.

10.  *Linko v. Indemn. Ins. Co. of N. Am.* (2000), 90 Ohio St.3d 445, 739 N.E.2d 338.

11.  *Raymond v. Sentry Ins.*, Lucas App. No. L–01–1357, 2002-Ohio-1228, 2002 WL 360736.

12.  Id; see, also, *Still v. Indiana Ins. Co.*, Stark App. No. 2001CA00300, 2002-Ohio-1004, 2002 WL 358652.  But, see, *Purvis v. Cincinnati Ins. Co.*, Greene App. No. 2001–CA–104, 2002-

{¶ 14}   Accordingly, we proceed to determine whether Erie made a sufficient offer of UM/UIM coverage.

{¶ 15}   In *Gyori* the Ohio Supreme Court held:

{¶ 16}   "1.  There can be no rejection pursuant to R.C. 3937.18(C) absent a written offer of uninsured motorist coverage from the insurance provider.

{¶ 17}   "2 In order for a rejection of uninsured motorist coverage to be expressly and knowingly made, such rejection must be in writing and must be received by the insurance company prior to the commencement of the policy year" [13]

{¶ 18}   The court also concluded that "[t]he mandates of R.C. 3937.18 apply to providers of excess coverage as well as providers of primary liability coverage." [14] Failure to properly offer or reject [UM/]UIM coverage results in coverage by operation of law.[15]  In *Linko*, the court explained that "*Gyori* stands for the proposition that we cannot know whether an insured has made an express, knowing rejection of UM/UIM coverage unless there is a written offer and written rejection.  It only follows that a valid rejection requires a meaningful offer, *i.e.*, an offer that is an offer in substance and not just in name." [16]  The court held that in order to satisfy the offer requirement, the insurer must (1) inform the insured of the availability of uninsured/underinsured motorist coverage, (2) set forth the premium for the coverage, (3) include a brief description of the coverage, and (4) expressly state the uninsured/underinsured coverage limits in its offer.[17]

{¶ 19}   Erie argues that, as an insurance agent charged with the duty of understanding and explaining available coverages to his customers,[18] David Shindollar should be treated as a special class of insureds and exempted from the mandates of R.C. 3937.18(C).  Erie further avers that there is no indication that he did not understand the implications of rejecting or selecting lower limits for UM/UIM coverage and asserts that the signed rejection within the umbrella

---

Ohio-1803, 2002 WL 538926;  *Martinez v. Travelers Ins. Co.*, Summit App. No. 20796, 2002-Ohio-1979, 2002 WL 701943.

13.   *Gyori*, 76 Ohio St.3d 565, 669 N.E.2d 824, paragraphs one and two of the syllabus.

14.   Id. at 568, 669 N.E.2d 824.

15.   Id. at 567, 669 N.E.2d 824.

16.   *Linko*, 90 Ohio St.3d at 449, 739 N.E.2d 338.

17.   Id. at 447–448, 739 N.E.2d 338.

18.   See *Wodrich v. Farmers Ins. of Columbus, Inc.* (May 21, 1999), Greene App. No. 98 CA 103.

policy and his selection of lower limits in the automobile policy provide sufficient evidence of an express rejection within the four corners of the insurance agreements to preclude implication of UM/UIM coverage.

{¶ 20} In *Gyori*, the Johnston Coca–Cola Bottling Group ("Johnston"), a sophisticated commercial buyer, had a policy of rejecting UM/UIM coverage when it was legally possible to do so and actively sought to minimize its insurance costs by making a knowing and express rejection of UM/UIM coverage. Consistent with company policy, John Rains, Risk Manager for Johnston and the person primarily responsible for procuring insurance for the company, enlisted the company's insurance broker to draft specifications and request bids for insurance rejecting or opting for minimally required coverage. In response thereto, National Union Fire Insurance Company prepared a policy, which excluded coverage but did not contain a rejection form. The broker discussed with Rains the coverages available, including UM/UIM, and then compared bids for the best price, eventually selecting the National Union policy. Upon appellate review, the court found that, despite the lack of a written offer or rejection, "[t]he undisputed facts * * * amply demonstrate that Johnston was well aware of the availability of UM coverage, understood it and made an informed and knowledgeable waiver of that coverage." [19] Nevertheless, upon further review, the Ohio Supreme Court held that *"however express and knowing Johnston's actions were, they could not constitute a rejection because there was no offer made which Johnston could reject."* [20] (Emphasis added.)

{¶ 21} Moreover, when presented with the question of whether a signatory's intent could be established by extrinsic evidence or whether the four corners of the insurance agreement control in determining whether a named insured's waiver was knowingly and expressly made, the *Linko* court expounded upon *Gyori*, holding:

{¶ 22} "We conclude that the four corners of the insurance agreement control in determining whether the waiver was knowingly and expressly made by each of the named insureds. Again, we cite *Gyori*, which requires a written offer and a written rejection of UM/UIM coverage. In *Gyori* this court made it clear that the issue of whether coverage was offered and rejected should be apparent from the contract itself. This court stated that the requirement of written offers 'will prevent needless litigation about whether the insurance company offered UM coverage.' * * * By requiring an offer and rejection to be in writing, this court impliedly held in *Gyori* that if the rejection is not within the contract, it is not

**19.** *Gyori*, 76 Ohio St.3d at 566–567, 669 N.E.2d 824.

**20.** Id. at 568, 669 N.E.2d 824.

valid. In doing so, this court greatly simplified the issue of proof in these types of cases—the offer and rejection are either there or they are not. Extrinsic evidence is not admissible to prove that a waiver was knowingly and expressly made by each of the named insureds."[21] (Emphasis added.)

{¶ 23} Therefore, David Shindollar's familiarity with or personal understanding of UM/UIM coverage is irrelevant to the determination of whether there has been a sufficient offer or rejection of UM/UIM coverage, and extrinsic evidence of his knowledge and experience is inadmissible for purposes of establishing the adequacy of Erie's offer or that coverage was knowingly and expressly waived. Accordingly, we proceed to examine the contents of the subject insurance agreements.

{¶ 24} The rejection form in *Linko* read:

{¶ 25} "Ohio Revised Code Section 3937.18 requires us to offer you Uninsured/Underinsured Motorists Insurance coverage in an amount equal to the policy bodily injury liability limit(s) with respect to any motor vehicle registered or principally garaged in the State of Ohio, unless you reject such coverage.

{¶ 26} "Unless you have previously rejected this coverage, your policy has been issued to include Uninsured/Underinsured Motorists Insurance coverage at limit(s) equal to the policy bodily injury liability limit(s)."[22]

{¶ 27} Reviewing this language, the court found that the "alleged offer is complete only in its incompleteness. It does not describe the coverage, does not list the premium costs of UM/UIM coverage, and does not expressly state the coverage limits."[23]

{¶ 28} As mentioned previously, the automobile policy herein provides bodily injury liability coverage in the amount of $250,000 per person and $500,000 per accident. However, UM/UIM coverage was selected in the amount of $100,000 per person and $300,000 per accident, which is lower than the limits of liability coverage. The portions of the application relating to UM/UIM coverage provide:

{¶ 29} "**Uninsured/Underinsured Motorists**

{¶ 30} "**Bodily Injury Per Person/Per Accident**

{¶ 31} "☐  **$15/30**

{¶ 32} "☐  _____

---

21. *Linko*, 90 Ohio St.3d at 450, 739 N.E.2d 338.

22. Id. at 448, 739 N.E.2d 338.

23. Id. at 449, 739 N.E.2d 338.

{¶ 33}  "See Item 23 on reverse side."

{¶ 34}  Item 23 provides:

{¶ 35}  "☐  REJECTION OF UNINSURED/UNDERINSURED MOTOR-IST COVERAGE OHIO I (we), the Named Insured, hereby reject insurance against Uninsured/Underinsured Motorists and as provided by Section 3937.18 Ohio Revised Code you are hereby requested to eliminate such coverage from my (our) policy and all renewals thereof (Must be signed by each Named Insured).

{¶ 36}  "☐  SELECTION OF LOWER LIMITS OF UNINSURED/UN-DERINSURED MOTORIST COVERAGE OHIO I (we), the Named Insured, reject Uninsured/Underinsured Motorists limits equal to my (our) Bodily Injury Limits.

{¶ 37}  "I (we) select instead $  ,000 per person and $  ,000 per accident."

{¶ 38}  The personal catastrophe policy rejection form appears as follows:

{¶ 39}  "REJECTION OF UNINSURED MOTORIST COVERAGE

{¶ 40}  "I (we) the Named Insured, decline insurance protection against Uninsured Motorists, including Underinsured Motorists.  I (we) request that you eliminate such coverage from my (our) policy and all future renewals."

■ {¶ 41}  The foregoing provisions do not describe the coverage, do not list the premium costs of UM/UIM coverage, and do not expressly state the coverage limits.  The automobile application and personal catastrophe rejection form, lacking in required information essential for a valid offer of UM/UIM coverage, cannot be termed a "written offer" that would allow an insured to make an express, knowing rejection of coverage equal to the liability limits of the underlying policies.[24]  As a result, UM/UIM coverage arises by operation of law in amounts equal to the policies' liability limits.[25]  Therefore, construing the evidence most favorably to Erie, reasonable minds could come to but one conclusion:  appellees were entitled to judgment as a matter of law.  Accordingly, Erie's assignment of error is overruled.

{¶ 42}  Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of trial court.

Judgment affirmed.

SHAW, P.J., and HADLEY, J., concur.

---

24.  Id.; *Rohr v. Cincinnati Ins. Co.*, Stark App. No. 2001CA00237, 2002-Ohio-1583, 2002 WL 491824.

25.  See *Poots v. Motorist Ins. Cos.* (1986), 38 Ohio App.3d 48, 49–50, 526 N.E.2d 71.