# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2010-NMSC-001

Filing Date: November 19, 2009

NO. 31,258

TIMOTHY MARCKSTADT,

      Plaintiff-Petitioner,

v.

LOCKHEED MARTIN CORPORATION MISSILES
& FIRE CONTROL, MID-CENTURY INSURANCE
COMPANY, and PACIFIC EMPLOYERS COMPANY
INSURANCE COMPANY OF PHILADELPHIA,
PENNSYLVANIA,

      Defendants-Respondents.

ORIGINAL PROCEEDING ON CERTIORARI
Jerald A. Valentine, District Judge

Consolidated with:

NO. 31,447

FEDERATED SERVICE INSURANCE
COMPANY, a Minnesota corporation,

      Plaintiff-Appellee,

v.

DANNY MARTINEZ,

      Defendant-Appellant.

CERTIFICATION FROM THE UNITED STATES COURT OF APPEALS FOR THE
TENTH CIRCUIT
Mary Beck Briscoe, Timothy M. Tymkovich, and Neil M. Gorsuch, Circuit Judges

Law Office of Stephen E. Hosford, P.C.
Stephen E. Hosford
Las Cruces, NM

for Petitioner

Butt, Thornton & Baehr, P.C.
Emily A. Franke
Albuquerque, NM

Stevens & Associates
J. Monty Stevens
El Paso, TX

Gant & Hicks, P.L.L.C.
Craig C. Gant
Dallas, TX

for Respondents

Peifer, Hanson & Mullins, P.A.
Robert E. Hanson
Lauren Keefe
Albuquerque, NM

for Appellee and
for Amicus Curiae Federated Service Insurance Company

Janet Santillanes, P.C.
Janet K. Santillanes
James T. Roach
Albuquerque, NM

Ewing & Ewing, P.C.
Steven C. Ewing
Albuquerque, NM

for Appellant and
for Amicus Curiae Danny Martinez

## OPINION

**CHÁVEZ, Chief Justice.**

2

**{1}** In these consolidated cases, Appellants, employees who were injured on the job, sought uninsured or underinsured (UM/UIM) motorist benefits under their employers' insurance policies, which were denied. They claim that because they were covered under their employers' automobile liability policies and because their employers and their employers' insurers failed to properly reject UM/UIM coverage, it should be read into their employers' policies. Specifically, Appellants argue that in order to reject UM/UIM coverage in New Mexico, the insured must provide the insurer with a written, signed rejection, which must be attached to the insurance policy. Appellees, the insurers in both cases and one of the employers, contend that because there is no dispute that the employers intended to reject such coverage, and because this rejection was evidenced by endorsements to their policies, UM/UIM coverage was successfully rejected.

**{2}** NMSA 1978, Section 66-5-301 (1983) provides, in relevant part:

A. No motor vehicle or automobile liability policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person and for injury to or destruction of property of others arising out of the ownership, maintenance or use of a motor vehicle shall be delivered or issued for delivery in New Mexico with respect to any motor vehicle registered or principally garaged in New Mexico unless coverage is provided therein or supplemental thereto . . . for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness or disease, including death, and for injury to or destruction of property resulting therefrom, according to the rules and regulations promulgated by, and under provisions filed with and approved by, the superintendent of insurance.

B. The uninsured motorist coverage described in Subsection A of this section shall include underinsured motorist coverage for persons protected by an insured's policy. . . .

C. . . . The named insured shall have the right to reject uninsured motorist coverage as described in Subsections A and B of this section[.]

13.12.3.9 NMAC provides that:

The rejection of the provisions covering damage caused by an uninsured or unknown motor vehicle as required in writing by the provisions of Section 66-5-301 NMSA 1978 must be endorsed, attached, stamped or otherwise made a part of the policy of bodily injury and property damage insurance.

**{3}** We consolidated these cases because they involve substantially similar issues. *Gov't Employees Ins. Co. v. Welch*, 2004-NMSC-014, ¶ 3, 135 N.M. 452, 90 P.3d 471. In *Marckstadt v. Lockheed Martin Corp.*, the issue reaches us on appeal of the district court's grant of summary judgment in favor of Appellees. In *Federated Service Insurance Co. v. Martinez*, the question has been certified from the Tenth Circuit Court of Appeals.

3

**{4}** Answering the question certified in *Federated*, we hold that an insurer must obtain a written rejection of UM/UIM coverage from the insured in order to exclude it from an automobile liability insurance policy under Section 66-5-301 and 13.12.3.9 NMAC. However, we hold that neither the statute nor the regulation requires that the insured's written rejection be signed. Also, despite the clear requirement under 13.12.3.9 NMAC that the rejection of UM/UIM coverage be attached, endorsed, stamped, or otherwise made part of the policy, we hold that the written rejection itself need not be made part of the policy. Accordingly, with respect to *Marckstadt*, because we cannot determine on the basis of the record before us whether the insurer obtained a written rejection of UM/UIM coverage from the insured, we find the district court's grant of summary judgment improper and remand.

## I.      BACKGROUND

### A.      *MARCKSTADT v. LOCKHEED MARTIN CORP.*

**{5}** The facts of *Marckstadt* are not in dispute. Defendant-Appellee Lockheed Martin Corp. entered into an insurance policy with Defendant-Appellee Pacific Employers Insurance Co. that became effective on September 1, 1998. It appears undisputed that the policy included some liability coverage for Plaintiff-Appellant Timothy Marckstadt, a Lockheed employee. The policy also included an endorsement entitled "Limits of Liability - Uninsured Motorists" that featured a list of states and next to each, either an "X" indicating the rejection of UM/UIM coverage or a dollar figure reflecting the state's "minimum limits." Next to New Mexico, the endorsement contained an "X" indicating rejection. Lockheed maintains that it intended to reject UM/UIM coverage, and Marckstadt does not appear to dispute this.

**{6}** However, the record is not clear regarding the circumstances resulting in the inclusion of this endorsement in the policy. There is no evidence of any discussions or correspondence in which Lockheed directed Pacific to exclude UM/UIM coverage from its policy. The record shows that before the policy went into effect, documents were provided to Lockheed "for [its] execution" that were subsequently returned to its underwriter post-execution. The record does not contain all of the documents that were "executed," but it does include a copy of the relevant endorsement and several associated portions of the policy as they appeared when Lockheed returned them to its underwriter. From these documents alone, it is not clear exactly what Lockheed did to "execute" its policy: there is no signature on the endorsement, and from the record we cannot determine whether it was Lockheed, Pacific, or some other party who drafted or filled in the endorsement, for example, by indicating with an "X" that coverage in New Mexico was rejected. It was only after the accident giving rise to this case that Lockheed signed a rejection of UM/UIM coverage.[1]

**{7}** On November 25, 1998, after the policy was in effect, Plaintiff-Appellant Timothy

---

[1]It is not entirely clear that this rejection applied to the policy covering Marckstadt, but because the rejection postdated the accident at issue here, it is not directly relevant, even if it applied to that policy.

Marckstadt was injured in an automobile accident through no fault of his own while acting within the scope and course of his employment by Lockheed. Marckstadt received workers' compensation benefits and was awarded $25,000 from Allstate, the insurer of the driver who hit him. He then brought this action, asking the district court to determine whether he was owed UIM benefits from his personal insurer, Farmers Insurance Group, or from his employer, Lockheed, or both. Marckstadt later amended his complaint to name Defendant Mid-Century Insurance Co. instead of Farmers and to include Pacific, Lockheed's insurance provider. Marckstadt's claims against Mid-Century were removed to arbitration and abated pending the determination of whether Lockheed was primarily responsible for UIM coverage. Lockheed and Pacific moved for summary judgment, claiming that because Lockheed's policy contained the endorsement reflecting Lockheed's intent to reject, UIM coverage had been rejected under Section 66-5-301 and 13.12.3.9 NMAC, and that, in any case, Marckstadt was precluded from seeking his claims under the Texas Workers' Compensation Act, Tex. Lab. Code Ann. § 408.001(a) (1993).

{8}     After a hearing, the district court granted summary judgment to Lockheed and Pacific, apparently finding that Section 66-5-301 did not support Marckstadt, and explaining that 13.12.3.9 NMAC

> may not be the best written regulation I ever saw. But I think that "or otherwise made part of the policy," I think that this matter–that Lockheed has done that. Even though they call it an endorsement. Even though there may be a question as to whether that endorsement should be signed, I think it's clear that they intended to reject it, and it is otherwise made a part of the policy.

The district court did not reach the question regarding the Texas workers' compensation statute. The Court of Appeals affirmed, holding that the attached but unsigned endorsement satisfied the requirements of the insurance code and regulations, and that public policy did not mandate a contrary outcome. *Marckstadt v. Lockheed Martin Corp.*, 2008-NMCA-138, ¶¶ 12, 23, 145 N.M. 90, 194 P.3d 121. Like the trial court, the Court of Appeals did not find support for Marckstadt in either the statute or the regulation. *Id.* ¶ 23. The Court opined that the regulation's purpose is to provide affirmative evidence to the insured of the rejection of coverage. *Id.* ¶ 12. Since the regulation allowed many methods of providing such evidence, and since there was no signature requirement on its face, the Court could find no evidence that a signature was required. *Id.* ¶¶ 15-23. In addition, the Court could not discern any policy reason to require a signature where "the insured maintains that he or she never doubted whether UM coverage had been rejected." *Id.* ¶ 21.

{9}     We granted certiorari to decide "[w]hether a rejection of uninsured motorist (UM) and/or underinsured motorist (UIM) coverage must be signed by the insured, in addition to being attached or otherwise made a part of the policy, before it constitutes a valid rejection under the provisions of [NMSA 1978,] §66-5-301 (1983)." Marckstadt asks us to reverse the district court's grant of summary judgment and remand.

## B.     *FEDERATED SERVICE INSURANCE CO. v. MARTINEZ*

**{10}** The facts of *Federated* are also undisputed. Capitol Motor Co. first obtained an automobile insurance policy from Plaintiff-Appellee Federated Service Insurance Co. in 2001. Again, it appears undisputed that the policy provided some liability coverage for the injured employee in this case, Defendant-Appellant Danny Martinez. In the original policy, Capitol elected to receive UM/UIM coverage in the amount of $500,000 per accident for management employees and $60,000 per accident for non-management employees. In November of 2001, Denny Rommann, a Federated employee, executed a change to Capitol's policy that eliminated UM/UIM coverage for non-management employees effective March 1, 2002. There was no written or signed rejection from Capitol leading to this change, but like Lockheed, it is uncontested that Capitol intended to reject coverage. Strangely, on March 29, 2002, Capitol's general manager, Mark Brandt, signed and returned a document to Federated that selected UM/UIM coverage in the amount of $60,000 per accident for non-management employees. Nevertheless, as of March 1, 2002, Capitol's premium for UM/UIM coverage for its non-management employees was returned. Subsequent renewed policies included endorsements rejecting UM/UIM coverage, none of which were signed by Capitol. The renewed policy that was in effect on May 11, 2005, included such an endorsement.

**{11}** On May 11, 2005, Martinez was struck by a car while working at Capitol as a non-management employee. He requested UM benefits from Federated, leading Federated to bring an action in federal court under diversity jurisdiction seeking a declaratory judgment that Martinez was not entitled to any benefits under its policy with Capitol. Martinez answered, seeking a declaratory judgment that Capitol's rejection was "contrary to insurance policy and therefore . . . invalid" and seeking damages for personal injury, breach of contract, bad faith violations of New Mexico's Insurance Code and Unfair Practices Act, and negligence.

**{12}** Federated moved for summary judgment, claiming that the endorsement to Federated's policy constituted a sufficient rejection under New Mexico law. Martinez also moved for summary judgment, stating that because there was no written rejection attached to the policy, rejection could not have been effective. The district court granted Federated's motion and dismissed all of Martinez's claims except for negligence. The district court reasoned that

> there does not appear to be any requirement under New Mexico law that a rejection of UM/UIM coverage takes any particular form, *e.g.*, a document with a box that must be checked to decline coverage. . . . So long as some means of making the rejection a part of the policy is employed "to clearly and unambiguously call to the attention of the insured the fact that such coverage has been waived," the requirements of New Mexico law are satisfied.

*Federated Serv. Ins. Co. v. Martinez*, No. 06-638, slip op. at 8 (D.N.M. Aug. 31, 2007) (quoting *Romero v. Dairyland Ins. Co.*, 111 N.M. 154, 156, 803 P.2d 243, 245 (1990)). The district court found this to be particularly the case in the context of a corporate policy when there was evidence that the insured party was fully aware of its right to have UM/UIM coverage. The district court's partial summary judgment was certified as a final judgment and appealed to the Tenth Circuit Court of Appeals, where Martinez asked the Court to hold as a matter of law that UM/UIM coverage had not been properly rejected because there was not a written rejection provided by the insured and

6

attached to the policy. The Tenth Circuit requested certification to this Court of the question of whether, "[f]or a valid rejection of UM/UIM coverage under New Mexico law, must that rejection be written, signed by the insured, and attached to the policy?" We accepted certification.

## II.    DISCUSSION

{13}    In these cases, the Court is asked to determine what is required under Section 66-5-301 and 13.12.3.9 NMAC to effectively reject UM/UIM coverage. There are no factual disputes. In both cases, Appellees argue that because the employers intended to reject UM/UIM coverage and endorsements to their policies evidenced this rejection, the statute and regulation were satisfied and summary judgment was justified. Neither of the Appellants disputes the existence of the endorsements or the parties' intent, but both suggest that some or all of the following additional steps were required under the statute and regulation: written rejection by the insured, signature of the rejection, and attachment of the rejection to the policy. In short, these cases present questions of law, which the Court reviews de novo. *See Pielhau v. RLI Ins. Co.*, 2008-NMCA-099, ¶ 6, 144 N.M. 554, 189 P.3d 687 ("We review de novo the granting of summary judgment[.]"); *Boradiansky v. State Farm Mut. Auto. Ins. Co.*, 2007-NMSC-015, ¶¶ 4-5, 141 N.M. 387, 156 P.3d 25 (applying de novo review to a certified question about the meaning of Section 66-5-301).

{14}    When deciding a statute's meaning, "[o]ur goal . . . is to determine and give effect to legislative intent. We do not depart from the plain language of a statute unless we must resolve an ambiguity, correct a mistake or absurdity, or deal with a conflict between different statutory provisions." *N.M. Bd. of Veterinary Med. v. Riegger*, 2007-NMSC-044, ¶ 11, 142 N.M. 248, 164 P.3d 947 (citation omitted). However, in light of the purpose of New Mexico's UM/UIM statute to expand coverage to protect members of the public against uninsured motorists, "[t]he statute is interpreted liberally to implement that remedial purpose, and any exception will be strictly construed." *Kaiser v. DeCarrera*, 1996-NMSC-050, ¶ 7, 122 N.M. 221, 923 P.2d 588 (citation omitted). Finally, although our task today also involves the interpretation of a regulation, the same principles apply. *Alliance Health of Santa Teresa, Inc. v. Nat'l Presto Indus., Inc.*, 2007-NMCA-157, ¶ 18, 143 N.M. 133, 173 P.3d 55 ("In interpreting sections of the Administrative Code, we apply the same rules as used in statutory interpretation." (citation omitted)).

## A.    13.12.3.9 NMAC REQUIRES AN INSURED TO REJECT UM/UIM COVERAGE IN WRITING

{15}    Section 66-5-301 and 13.12.3.9 NMAC were designed to "expand insurance coverage to protect the public from damage or injury caused by other motorists who were not insured and could not make the impaired party whole." *Sandoval v. Valdez*, 91 N.M. 705, 707, 580 P.2d 131, 133 (Ct. App. 1978). The policy of expanding UM/UIM coverage is reflected in the plain language of Section 66-5-301(A) and (B), which mandates that all automobile liability policies shall include UM/UIM coverage for the persons insured under the liability policy. This section, however, is qualified by Section 66-5-301(C), which provides that "[t]he named insured shall have the right to reject[.]" Read as a whole, Section 66-5-301 makes UM/UIM coverage the default when the insured has not exercised the right to reject. *See Vigil v. Rio Grande Ins. of Santa Fe*, 1997-NMCA-124,

¶ 7, 124 N.M. 324, 950 P.2d 297 ("[T]he statute also allows an insured to *choose not to purchase* UM coverage by specifically rejecting such coverage." (emphasis added)). From the statute's text, we can deduce that the insurer may not exclude UM/UIM coverage from an automobile liability policy unless it has offered it to the insured, *see Montano v. Allstate Indem. Co.*, 2004-NMSC-020, ¶ 16, 135 N.M. 681, 92 P.3d 1255, and the insured has exercised the right to reject the coverage through some positive act. Section 66-5-301(C).

**{16}** Section 66-5-301 does not explicitly address the *manner* in which the offer or rejection of UM/UIM coverage must take place. However, under the statute's plain language and the unambiguous policies embodied within it, we believe that certain implications can clearly be discerned. For example, in order for the offer and rejection requirements of Section 66-5-301 to effectuate the policy of expanding UM/UIM coverage, the insurer is required to *meaningfully offer* such coverage and the insured must *knowingly and intelligently act* to reject it before it can be excluded from a policy. *Romero*, 111 N.M. at 156, 803 P.2d at 245. Thus, an offer of UM/UIM coverage could, in principle, be so inadequate or misleading as to render a rejection ineffective under the statute. Conversely, even if an offer of UM/UIM coverage were completely adequate, we would not find that coverage had been rejected if the insured never acted to reject coverage, even if an endorsement were attached to the policy by the insurer. Further, because of the distinct risks of miscommunication and confusion in the context of complex insurance agreements, *see Montano*, 2004-NMSC-020, ¶ 17, and our statute's clear policy of expanding UM/UIM coverage, we do not believe it would be wholly implausible to interpret Section 66-5-301 alone to require the insured not just to affirmatively act to reject coverage, but specifically to make its rejection in writing. *See, e.g.*, *Gyori v. Johnston Coca-Cola Bottling Group, Inc.*, 669 N.E.2d 824, 827 (Ohio 1996) (holding, under a UM/UIM statute quite similar to New Mexico's, that "the spirit of [the statute] is best served by requiring the offer to be in writing. Such a requirement will prevent needless litigation about whether the insurance company offered UM coverage and will in the long run benefit insurance companies[,]" and that this reasoning "necessitates the same requirement for rejections. Such a requirement will lessen the difficulty of proving rejection in a case such as this. We are persuaded that requiring rejection of UM coverage to be in writing comports with the spirit of [the statute] and with public policy."), *superseded by statute as recognized in Shindollar v. Erie Ins. Co.*, 774 N.E.2d 316, 319 (Ohio Ct. App. 2002). However, we also recognize that such a writing requirement simply does not appear on the face of the statute. *See id.* at 827 (Cook, J., dissenting).

**{17}** In contrast, we believe that a written rejection requirement can unambiguously be found in 13.12.3.9 NMAC. Promulgated under Section 66-5-301's grant of authority to create rules and regulations concerning UM/UIM coverage, the words of 13.12.3.9 NMAC bear repeating:

> The rejection of the provisions covering damage caused by an uninsured or unknown motor vehicle as required in writing by the provisions of Section 66-5-301 NMSA 1978 must be endorsed, attached, stamped or otherwise made a part of the policy of bodily injury and property damage insurance.

**{18}** Unless the rejection requirements of 13.12.3.9 NMAC are strictly met, UM/UIM coverage will be read into an automobile liability policy. *Romero*, 111 N.M. at 155, 803 P.2d at 244

("[U]nless the named insured rejects [UM/UIM] coverage in a manner consistent with the requirements imposed by the superintendent of insurance, uninsured motorist coverage will be read into the insured's automobile liability insurance policy *regardless of the intent of the parties* or the fact that a premium has not been paid." (emphasis added)). For this reason, although we agree with Appellees' suggestion that public policy generally supports freedom of contract, *see Lynch v. Santa Fe Nat'l Bank*, 97 N.M. 554, 560, 627 P.2d 1247, 1253 (Ct. App. 1981), the necessity of meeting the statutory and regulatory requirements plainly conditions freedom of contract in this limited situation. *See id.* (recognizing that public policy supports the parties' freedom to contract "unless they clearly contravene some positive law" (internal quotation marks and citation omitted)). Therefore, although Appellees were free to reject UM/UIM coverage for their employees, they were obliged to do so in accordance with the law.

{19} Cases applying 13.12.3.9 NMAC have focused on its "endorsed, attached, stamped or otherwise made a part of" language. For example, in *Romero*, this Court considered the case of an insured who claimed uninsured motorist coverage under her liability policy despite the fact that she had knowingly signed a waiver of such coverage and had not paid premiums for it. 111 N.M. at 155-59, 803 P.2d at 244-48. We held in her favor because

> The rejection must be made a part of the policy by endorsement on the declarations sheet, by attachment of the written rejection to the policy, or by some other means that makes the rejection a part of the policy so as to clearly and unambiguously call to the attention of the insured the fact that such coverage has been waived.

*Id*. at 156, 803 P.2d at 245. We reasoned that strict compliance was required under the insurance regulations, and that, in any case, this outcome furthered the policy of giving the insured "affirmative evidence of the extent of coverage" to enable him or her to make informed choices about coverage. *Id*. A similar conclusion was reached in *Kaiser*, in which this Court held that UM/UIM coverage had not been effectively rejected, despite the insurance company's receipt of a signed waiver from the insured, because the policy contained no evidence of the rejection, even though the insurance company had made unsuccessful efforts to mail an updated declarations page to the insured. 1996-NMSC-050, ¶¶ 1-4, 17.

{20} We disagree with Appellees that placing evidence of the rejection in the policy is the *only* requirement to be found in the regulation. 13.12.3.9 NMAC states that the rejection, "*as required in writing* by the provisions of Section 66-5-301 NMSA 1978" (emphasis added), must be made part of the policy. Curiously, as we have noted, Section 66-5-301 does not explicitly require the rejection to be in writing; the only mention of a writing in the statute concerns requests to *reinstate* UM/UIM coverage when it has been previously rejected. Section 66-5-301(C). Despite its lack of clarity, we cannot simply ignore this portion of the regulation. *Benavidez v. Sierra Blanca Motors*, 1996-NMSC-045, 122 N.M. 209, 213, 922 P.2d 1205, 1209 ("We presume that the [agency] is well informed regarding existing statutory and common law and does not intend to enact a nullity."). Since the "in writing" language cannot restate a statutory requirement, we believe it must state an additional explicit requirement: that the rejection must be in writing.

**{21}** To create such a requirement was certainly within the authority delegated to the superintendent of insurance under Section 66-5-301(A). *Willey v. Farmers Ins. Group*, 86 N.M. 325, 327, 523 P.2d 1351, 1353 (1974) ("The authority granted to the superintendent of insurance is a lawful delegation of authority to an administrative agency."), *overruled on other grounds by Found. Reserve Ins. Co. v. Marin*, 109 N.M. 533, 535, 787 P.2d 452, 454 (1990). The written rejection requirement furthers the policy of expanding UM/UIM coverage by assuring that the insured is sufficiently informed before rejecting coverage, alerting the insured to the importance of the decision, and providing clear evidence of a decision to reject, reducing litigation after the fact. In cases where the insured and insurer dispute whether coverage was rejected, without a written rejection requirement, courts are forced to decide whether the insured acted to reject based solely on extrinsic evidence of the parties' intentions. In cases where the insured and the insurer agree that coverage was rejected but a third party claims coverage, without a written rejection requirement, the third party is susceptible to fraud.

**{22}** Appellees suggest that "in writing" merely applies to the subsequent portion of the regulation such that only the endorsement, attachment, stamp, or other means of making the rejection part of the policy must be in writing, and not the insured's rejection of UM/UIM coverage itself. We disagree. First, Appellees' construction of the "in writing" provision would reduce that language to a redundancy. Obviously, whatever is attached, endorsed, stamped, or otherwise made part of the policy, providing evidence of the decision to reject, must be in writing, because policies are written instruments. We hesitate to read the regulation to render certain terms extraneous. *See T.W.I.W., Inc. v. Rhudy*, 96 N.M. 354, 357, 630 P.2d 753, 756 (1981) ("[Regulations] must be construed so that no part of the [regulation] is rendered surplusage, if possible."). Second, we believe Appellees' reading contradicts the regulation's plain language. The regulation states that the rejection of UM/UIM coverage as required by the statute must be in writing. However, the statute does not speak to the necessity of endorsing, attaching, or otherwise making the rejection part of the policy. This requirement is found only in the regulation. As a result, the rejection which the regulation requires to be in writing must be the *act* of rejection described in the statute and not the *evidence* of that act mandated by the regulation itself.

**{23}** We note that although no New Mexico case has directly decided the question of whether an insured must reject UM/UIM coverage in writing, other cases that have found occasion to comment on it have also concluded that the insured must provide a written rejection before UM/UIM coverage can be excluded from an automobile liability policy. *See, e.g.*, *Montano*, 2004-NMSC-020, ¶ 19 (basing its requirement of a written waiver of stacking in part on its observation that the New Mexico's UM/UIM statute and regulations "[have] been interpreted as requiring an insured to reject UM coverage in writing" (citation omitted)); *Kaiser*, 1996-NMSC-050, ¶ 8 ("Even though an insured may sign a rejection notice of UM/UIM coverage, *that alone is not enough*. The rejection notice *must also* be endorsed, attached, stamped or otherwise made a part of the policy to be effective." (internal quotation marks and citation omitted) (emphasis added)); *Romero*, 111 N.M. at 156, 803 P.2d at 245 ("The rejection must be made a part of the policy by endorsement on the declarations sheet, *by attachment of the written rejection* to the policy, or by some other means that makes the rejection a part of the policy so as to clearly and unambiguously call to the attention of the insured the fact that such coverage has been waived." (emphasis added)). Following this long-

10

held understanding, we hold that 13.12.3.19 NMAC requires an insured to reject UM/UIM coverage in writing.

## B.    THE INSURED'S WRITTEN REJECTION NEED NOT BE SIGNED TO BE EFFECTIVE

**{24}**    We next consider whether, as Appellants suggest, the written rejection must be signed by the insured. We conclude that a signature is not required. First, unlike the writing requirement, neither the statute nor the regulation includes any explicit mention of signature. As Appellees point out, the Legislature has explicitly required signatures in related contexts where it desires them. *See, e.g.*, NMSA 1978, § 66-5-222 (1977, as amended through 1998) (requiring signatures on driver exclusion endorsement forms). Second, we are not prepared to hold that the words "in writing" necessarily imply that a signature is required in any context. *See* Black's Law Dictionary 1748 (9th ed. 2009) (defining "writing" as "[a]ny intentional recording of words that may be viewed or heard with or without mechanical aids" and distinguishing it from a "signed writing," which is defined as "[a] writing to which a person's signature has been affixed in some form"). Although as a matter of prudence, it might appeal to us to require the signature of the insured to effectively reject coverage,[2] *see Lane v. Lane*, 1996-NMCA-023, ¶ 20, 121 N.M. 414, 912 P.2d 290 (explaining that a signature requirement can serve both an evidentiary purpose, assuring that the signatory actually gave consent, and a cautionary purpose, because "[o]ne who pauses to sign a document can be expected to give more thought to the consequences of consent than one who gives consent in a less formal setting"), we are asked in this case only to interpret Section 66-5-301 and 13.12.3.9 NMAC. Given the lack of an express signature requirement in these provisions, we cannot conclude that there is no situation in which a written but unsigned rejection of coverage would satisfy the letter of and policy behind the statute and regulation.

## C.    THE INSURED'S WRITTEN OBJECTION DOES NOT NEED TO BE ATTACHED TO THE POLICY

**{25}**    We also disagree with Appellants' contention that the written rejection itself must be attached to the policy in order for rejection to be effective. It is correct that the automobile liability policy must contain some evidence of the insured's rejection in order to satisfy 13.12.3.9 NMAC. *Romero*, 111 N.M. at 156, 803 P.2d at 245. However, we note that the command of the regulation is phrased in the form of a disjunctive: the rejection "must be endorsed, attached, stamped *or*

---

[2]It seems to have appealed to insurers as well. Although it is not a matter of record in this case, we observe that many UM/UIM cases suggest that the insurance industry already has adopted a practice of seeking signed rejections. *See, e.g.*, *Kaiser*, 1996-NMSC-050, ¶ 2 (explaining that the plaintiff signed a UM/UIM rejection notice from his insurer); *Romero*, 111 N.M. at 155, 803 P.2d at 244 (reproducing the rejection form, including space for a signature, used by the plaintiff's insurer); *Vigil*, 1997-NMCA-124, ¶ 9 (detailing the signed rejection form obtained from the plaintiff). Indeed, in *Marckstadt*, Pacific obtained a signed waiver from Lockheed after the accident at issue.

*otherwise made a part* of the policy of bodily injury and property damage insurance." 13.12.3.9 NMAC (emphasis added). Thus, although the sufficiency of a particular form of endorsement or attachment might be subject to debate, we cannot hold that the regulation may only be satisfied by the attachment of the written rejection provided to the insurer by the insured. Certainly other forms of notification could function equally well "to clearly and unambiguously call to the attention of the insured the fact that such coverage has been waived." *Romero*, 111 N.M. at 156, 803 P.2d at 245.

{26}    To summarize, we hold that in order to exclude UM/UIM coverage from an automobile liability policy pursuant to Section 66-5-301 and 13.12.3.9 NMAC, the insurer must obtain a written rejection from the insured, but that the written rejection need not be signed or attached to the policy. Obviously the insurer may attach the written rejection itself to the policy and be in compliance with the regulation. Alternatively, once the insurer obtains a written rejection from the insured, it may choose not to attach the written rejection itself to the policy. However, we reiterate our holding in *Romero* that 13.12.3.9 NMAC requires that some evidence of the insured's written rejection of UM/UIM coverage must be made part of the policy by endorsement, attachment, or some other means that calls the insured's attention to the fact that such coverage has been waived. *Id.*

## D.    OUR HOLDING APPLIES TO THIS CASE

{27}    Appellees suggest that even if this is our holding, the circumstances of the cases at bar should lead us to draw exceptions for three reasons. First, Appellees argue that because the insurers and the insureds agree that the insureds intended to reject UM/UIM coverage, the employees, as third-party beneficiaries, should not be permitted to seek to modify the terms of their agreement. Appellees point to *Jaramillo v. Providence Washington Insurance Co.*, in which we wrote that "[i]n cases in which the question is whether a third-party beneficiary is entitled to coverage, if the premium-paying insured and the insurer agree as to what they intended, that should be controlling." 117 N.M. 337, 341-42, 871 P.2d 1343, 1347-48 (1994). We do not believe this statement applies to the case at bar. In *Jaramillo*, two of the plaintiffs, employees of the insured, claimed that they should be able to stack UM bodily injury coverages under their employer's policy. *Id*. at 339, 871 P.2d at 1345. The policy only allowed class-one insureds to stack coverage. *Id*. at 340-41, 871 P.2d at 1346-47. The district court granted summary judgment in these plaintiffs' favor, ruling that the policy's definition of who was a class-one insured was ambiguous as a matter of law and must be construed in favor of coverage. *Id*. at 339, 871 P.2d at 1345. We reversed, holding that ambiguities did not need to be construed in favor of coverage by "a third party who is not expressly named as the insured or who is not an acknowledged family member[.]" *Id*. at 341, 871 P.2d at 1347. To the contrary, if the premium-paying insured and insurer agree that the third party was not intended to be included under the provision allowing stacking, their understanding should control. *Id*. at 342, 871 P.2d at 1348.

{28}    The case before us is distinguishable from *Jaramillo*. Here, there is no dispute that Appellants were the intended beneficiaries of liability coverage under their employers' policies. The only dispute is whether this coverage included UM/UIM coverage. Unlike the availability of policy stacking in *Jaramillo*, the question of the presence of UM/UIM coverage under an automobile liability policy is not a question of intent. Section 66-5-301 and 13.12.3.9 NMAC provide that

automobile liability policies shall contain UM/UIM coverage in the absence of an appropriate rejection, irrespective of the parties' intent. *Romero*, 111 N.M. at 155, 803 P.2d at 244. Appellants recognize this principle and argue that rejection was ineffective, and therefore, as a matter of law, their coverage includes UM/UIM coverage. Unlike *Jaramillo*, in which the central question of the case had to be settled by referring to the parties' intent in signing the contract, here, the question of the intent to include or not to include the third-party beneficiaries in UM/UIM coverage is irrelevant because the issue is whether the rejection, if any, conformed with the requirements of the statute and the regulation. Even if the statutory or regulatory mechanisms are not perfectly adapted to their goals–risking the possibility that fully knowing rejections might be found technically inadequate–we cannot subvert the clear mandate of the regulation. Further, to hold as Appellees suggest would benefit them at the cost of potentially harming other employees such as Appellants who could be exposed to fraud. Moreover, it would undermine what we perceive to be the effort of both the Legislature and the superintendent of insurance to impose more uniformity on often-confusing insurance agreements.

**{29}** In a second argument for an exception from our holding, Appellees contend that Lockheed and Capitol, as sophisticated commercial parties, should not be held to the same standards as individual policyholders. We cannot draw such a distinction here. Appellees contend that *Rehders v. Allstate Insurance Co.*, 2006-NMCA-058, 139 N.M. 536, 135 P.3d 237 stands for the proposition that New Mexico courts apply a different, more stringent standard in cases involving commercial policies. We need not determine whether *Rehders* stands for such a broad proposition here because it is wholly inapplicable to the issue before us. In *Rehders*, the Court of Appeals construed a corporate policy to determine whether the son of the sole shareholders of the named insured corporation was a class-one insured. *Id.* ¶¶ 1, 15-18. Here, we are not at all concerned with interpreting language in the relevant policies. Rather, we are concerned with legislative intent and must construe Section 66-5-301 and 13.12.3.9 NMAC. Because neither of these provisions contains any hint of differing standards for commercial, as opposed to individual, policies, we decline Appellees' invitation to interpret their policies more strictly against the insureds. Moreover, the regulation applies to the insurer, not the insured. Therefore, we cannot concern ourselves with the sophistication of the insured when the regulation imposes burdens on the insurer and not the insured.

**{30}** Finally, Appellees argue that even if our holding does apply to situations such as the case at bar, it should be applied prospectively. Appellees contend that because various federal courts and the lower court in this case have drawn different conclusions on this question, *compare Marckstadt*, 2008-NMCA-138, *with Farm Bureau Mut. Ins. Co. v. Jameson*, 472 F. Supp. 2d 1272 (D.N.M. 2006), our holding is not easily foreshadowed such that it would be unfair to apply it to existing policies. Appellees point to *Montano*, in which we modified the judicially-created doctrine of stacking to require written rejection of stacked coverage where previously we had utilized a case-by-case ambiguity analysis. 2004-NMSC-020, ¶ 17. We observed that this "new, and not easily foreshadowed, aspect to our jurisprudence" could not equitably be applied to the insurer in that case "before it has had an opportunity to alter its policy language[.]" *Id.* ¶ 22.

**{31}** We do not believe that *Montano*'s reasoning applies here. Generally speaking, there is a

presumption that the holding of a civil case will apply retroactively. *Beavers v. Johnson Controls World Servs., Inc.*, 118 N.M. 391, 398, 881 P.2d 1376, 1383 (1994). We are empowered to limit a holding to prospective application depending on the weight of the following factors:

> First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, or by deciding an issue of first impression whose resolution was not clearly foreshadowed.

> Second, it has been stressed that we must weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation.

> Finally, we have weighed the inequity imposed by retroactive application, for where a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity.

*Id.* (internal quotation marks, citations, and alterations in original omitted). We do not believe that these factors weigh in favor of prospectivity. First, the holding we announce today is not clearly a new rule: it does not supplant any prior rule, and although it is an issue of first impression, we believe that as a matter of statutory and regulatory interpretation drawing on explicit language in the relevant provisions, the parties could have foreseen this result. Indeed, although it is not a matter of record how common the practice already may be, we have observed that even in *Marckstadt*, Pacific did obtain a written, signed waiver from Lockheed–although it was too late to affect its coverage of Marckstadt. We also noted in footnote 2 that, at least since 1990, insurance companies have not only obtained written rejections, they have obtained signed, written rejections, which suggests either that the superintendent of insurance codified an existing practice or insurance companies understood perfectly that written rejections are required in New Mexico. Of course, even if the outcome of our decision was difficult to foresee, there could not have been any reliance on a different rule, since none had been announced by a New Mexico court in any other case. *See id.* at 399, 881 P.2d at 1384 (discussing reliance as a factor in determining the retroactive application of a new rule of law). Second, the purpose of the rule we recognize today is to promote the Legislature's remedial policy of expanding UM/UIM coverage by assuring that rejections are knowingly and intelligently made. *See Romero*, 111 N.M. at 156, 803 P.2d at 245. The Legislature and the superintendent of insurance intended their rules to take effect immediately, and we will not second-guess them. Third, we do not perceive any serious risk of inequity. There is no hardship in applying a foreseeable rule, and to the extent that our holding was difficult to anticipate, the hardship we cause to insurance companies seems equal to the hardship we would cause to many rightful beneficiaries of UM/UIM coverage should we apply our rule prospectively. *See Padilla v. Wall Colmonoy Corp.*, 2006-NMCA-137, ¶ 22, 140 N.M. 630, 145 P.3d 110 (acknowledging that in determining the retroactive application of a decision that changes the law, the Court should evaluate the potential unfairness to the defendants, the plaintiffs, and *potential future* plaintiffs). For these reasons, we decline to limit our holding to prospective application.

14

## III.    CONCLUSION

**{32}**    Under Section 66-5-301 and 13.12.3.9 NMAC, insurance companies must obtain written rejections of UM/UIM coverage from the insured to exclude such coverage from automobile liability insurance policies.  However,  such waivers need not be signed or attached to the policy to be effective.  We therefore answer the certified question in *Federated* partly in the affirmative and partly in the negative.  We reverse the trial court's grant of summary judgment in *Marckstadt* and remand to the district court to determine whether the insured rejected UM/UIM coverage in writing.

**{33}    IT IS SO ORDERED.**

_____
                                                                          **EDWARD L. CHÁVEZ, Chief Justice**

**WE CONCUR:**


_____
**PATRICIO M. SERNA, Justice**


_____
**PETRA JIMENEZ MAES, Justice**


_____
**CHARLES W. DANIELS, Justice**

**RICHARD C. BOSSON, Justice, dissenting**

**BOSSON, Justice (dissenting).**

**{34}**    The Tenth Circuit certified the following question to us:  "For a valid rejection of UM/UIM coverage under New Mexico law, must that rejection be written, signed by the insured, and attached to the policy?"  Plaintiffs have urged us to answer in the affirmative.  In other words, the rejection would have to be in writing, signed by the insured, and physically attached to the policy.  The majority opinion comes to a different conclusion with which I partially agree.  Correctly, the rejection does not have to be signed by the insured or attached to the policy because nothing in the statute or the insurance regulation requires either.  And no opinion from this Court has ever required a signature or an attachment.  In fact, physical attachment is only one of several ways to make the rejection a part of the policy; the policy can just say "UM coverage rejected" without any attachment and that should take care of it.

**{35}**    Our only dispute now reduces to whether the rejection must not only be made a part of the written policy (with which we all agree), but also whether that rejection must appear in a prior writing that precedes the policy.  The majority opinion  now requires, for the very first time, *two*

15

writings–a kind of belt and suspenders approach. First, the insured must indicate in writing (but not necessarily sign it) his or her decision to reject UM coverage, and then, independently, the policy must also state the fact of rejection.

**{36}** In our two consolidated cases, of course, the decision to reject is quite clearly stated in the policy, and there is no dispute about this. This is not simply a case of the policy not *including* or not *mentioning* UM coverage or being otherwise vague; both policies affirmatively *reject* UM coverage for their employees just as the law allows. All agree on this record that such a choice represented a conscious decision by the employer—the insured party and the owner of the policy—to reject UM coverage for employees, however irresponsible that decision may have been.

**{37}** What is not clear, however, is whether the insurer also issued a separate, initial document preceding the policy in which the employer first indicated its desire to reject. I suspect not, given that these employers are both commercial entities, likely accustomed to conducting their insurance business through agents, with advice of counsel, and in a less structured manner. The salient point, however, is that in both cases, the employer as insured stands behind its decision to reject coverage. Both insureds acknowledge their choice to reject UM coverage for their employees, a decision which each insured asks this Court to respect.

**{38}** If freedom of contract means anything, it must be that—absent a statutory requirement of UM coverage—corporate employers like Lockheed and Capitol Motors are free to make a knowing, informed business decision about who *not* to insure and when *not* to insure them. They are free to choose. For as long as we have been a state, New Mexico has recognized the right of parties to contract as they see fit, especially in their business affairs. It is part of the common law we inherited, first from England, and then from 19th Century America before statehood. Freedom to contract remains firmly rooted in our jurisprudence. As a judiciary, exercising proper restraint, we do not interfere with such business decisions without clear guidance from either the legislature or an authorized executive agency.

**{39}** Without much hyperbole, the freedom to contract is part of fundamental personal liberty. It cuts against that notion of liberty to be told that, although the law allows a company to reject UM insurance coverage for its employees and the company does so openly and knowingly, the courts are now going to countermand that business decision. It seems all the more offensive to interfere simply because of a lack of a *second* writing—one the company did not need, did not ask for, and still does not ask for today. It is a writing that would not have made any difference in the context of these two cases. The majority does not dispute the futility of such an exercise in these two cases, a futility which Judge Parker acknowledges—and on which he appropriately relies—in the Capitol Motors case. If ever there was a hyper-technicality, this seems like one.

**{40}** The majority takes the position that the insured's intent is irrelevant; it boils down instead to the supposedly "clear" language of the statute and insurance regulation. The statute, of course, makes no mention of a writing; it only says the insured may reject UM coverage without any mention of the means of rejection—in writing, verbally, or I suppose by any other method. Curiously, the regulation says: "The rejection [of UM coverage] *as required in writing* by the

provisions of Section 66-5-301 must be endorsed, attached, stamped or otherwise made a part of the policy." Since the statute clearly does *not* require any such writing, we are left in some doubt as to what the regulation means. What is clear, however, is that the rejection must thereafter be made part of the written insurance policy, one way or the other. If there is a written rejection, it can be attached to the policy or duplicated within the policy. If the rejection is not in writing, like these two cases, then it must appear in writing as part of the policy.

{41}     Our case law attempts to fill the gap left by such an awkwardly phrased regulation. Time after time, we have said that an initial rejection of UM coverage, even if signed by the insured, is not good enough; it must thereafter appear in, or be attached to, or "otherwise made a part of" the written policy. The insured must be given a second chance to reflect over a decision to reject UM coverage. *See Romero v. Dairyland Ins. Co.*, 111 N.M. 154, 156, 803 P.2d 243, 245 (1990) ("Upon further reflection, consultation with other individuals, or after merely having an opportunity to review one's policy at home, an individual may well reconsider his or her rejection of uninsured motorist coverage."). Fair enough. And since context is everything in the law, just who are we trying to protect with this construction? More to the point, who is the Insurance Superintendent trying to protect by affording the insured this second chance? Josie Romero comes immediately to mind.

{42}     Upon reading the *Romero* opinion, one cannot forget the plight of poor Josie Romero, a 59-year-old widow, purchasing insurance for the first time, who did not even have a driver's license. Although she had rejected UM coverage in writing, it was not made part of the policy, and she apparently had no independent understanding  of what she had done. Correctly, the opinion makes reference to the need of insureds like Josie Romero who are "unsophisticated in business affairs," those who need our help and the help of the Insurance Superintendent. *Id.* at 159, 803 P.2d at 248. I agree. It takes no great leap to conclude that Section 66-5-301 and the insurance regulation were written with the average individual and family in mind. The Insurance Superintendent was likely preoccupied with helping those who need our help, not those who do not.

{43}     Justice Ransom's opinion in *Romero* makes clear that the requirement of a writing is not an end in itself but is designed to serve a remedial purpose: "so as to clearly and unambiguously call to the attention of the insured the fact that such coverage has been waived." 111 N.M. at 156, 803 P.2d at 245. The purpose of the regulation is to protect those who are easily preyed upon like Josie Romero. I do not believe Justice Ransom's intent, or his language, can be read to apply to every case, regardless of the circumstances, regardless of the need.

{44}     Importantly, I do not read Justice Ransom to negate an insured's choice when the insured, like Lockheed and Capitol Motor, seek to *enforce* that choice, not overturn it. Most of the case law on which he relies simply requires *one* written rejection, usually the policy itself if the initial rejection was oral. What purpose, other than to set a trap for the unwary, would there be in requiring not one but two writings, "so as to clearly and unambiguously call to the attention of the insured," when a corporate "insured" like Lockheed or Capitol Motor is fully aware of "the fact that such coverage has been waived?"

17

**{45}** This is indeed the point of friction. Most of our UM jurisprudence interpreting this statute and the insurance regulation derives from people like Josie Romero who truly need the "belt and suspenders" approach. Implicit in our opinions is the plight of the individual insured trying to come to terms with indecipherable insurance jargon and policies as dense as any jungle. Even when faced with a knowledgeable insured, we allowed the insured to rescind a rejection that had never found its way into the written policy. *Kaiser v. DeCarrera*, 1996-NMSC-050, 122 N.M. 221, 923 P.2d 588.

**{46}** We have never, however, forced UM coverage upon an insured who had rejected coverage initially, that rejection appeared in the policy, and the insured went to court to *defend that rejection.* None of our case law has ever applied the insurance regulation to businesses like Lockheed and Capitol Motors who made an informed choice, knew what they were doing, put that choice in the policy, and now seek to ratify not abandon that choice in this litigation. None of our case law has ever said that, even though the rejection is clearly "part of the policy" as the regulation requires, the courts will vitiate that choice because (1) it was not preceded by an additional writing  never before required, and (2) an employee who was *not* a party to the insurance contract now claims rights under the contract that his employer has expressly disavowed.

**{47}** The Legislature or the Insurance Superintendent could make employees mandatory third-party beneficiaries of their employers' insurance contracts. Employees could be given a place at the table when their employers negotiate insurance coverage to benefit the company. Labor unions might negotiate for such access to protect their rank and file. All this is possible, and perhaps desirable, but completely missing from this case. The Legislature or the Insurance Superintendent, not this Court, should make that decision.

**{48}** When the employer knowingly decides *not* to purchase UM coverage for its employees, this Court has respected that choice. In *Lucero v. New Mexico Public School Insurance Authority*, 119 N.M. 465, 465, 892 P.2d 598, 598 (1995), a school employee driving a vehicle owned and insured by the school district was injured by an uninsured driver. She sued for uninsured motorist coverage from the school district. The school district, as the insured, had excluded employees from the policy's UM coverage, though it is not clear from the opinion whether that rejection was in a separate writing or verbally. It did not seem to make any difference to this Court.

**{49}** Recognizing that the named insured—the employer—had the right under New Mexico law to reject UM coverage, including for its employees, this Court affirmed that choice, noting that both the insured (the school district) and the insurer agreed (shared the *intent*) that employees were not included within the policy's UM coverage. Justice Franchini wrote (Justices Frost and Minzner concurring) that, "When both the insurance company and the named insured agreed as to the identity of the third-party beneficiaries [employees] of an insurance contract purchased by the named insured, the court will enforce that interpretation of the contract." *Id.* at 466, 892 P.2d at 599. *Archunde v. International Surplus Lines Insurance Company*, 120 N.M. 724, 729, 905 P.2d 1128, 1133 (Ct. App. 1995), although factually more complex, came to a similar conclusion in which the named insureds, the school bus company and the school district, had rejected UM coverage for their employees. *See also Jaramillo v. Providence Washington Ins. Co.* 117 N.M. 337, 341-42, 871 P.

18

2d 1343, 1347-48 (1994) (Ransom, J.) ("In cases in which the question is whether a third-party beneficiary is entitled to coverage, if the premium-paying insured and the insurer agree as to what they intended, that should be controlling.").

**{50}**    In short, I would respect the clear, unambiguous, and uncontradicted intent of all parties to these insurance contracts to do as the law allows, and omit UM coverage for their employees. Even if I could be persuaded differently, I would still opt not to apply this opinion to the two employers before us. It seems unfair to do so in this instance. I cannot agree that this opinion was "foreseeable" to anyone who read our prior cases. Lockheed, in particular, appears to have done its homework and should not be faulted for relying on case law that emphasized inclusion of the rejection in the written policy, not in a second, separate writing. It is easy enough to say now that two writings have always been required. Suffice it to say that in these two consolidated cases alone, both district judges and a unanimous panel of the New Mexico Court of Appeals thought otherwise. I would give both Lockheed and Capitol Motors the benefit of considerable doubt as to any such requirement and apply our holding prospectively only.

_____
**RICHARD C.  BOSSON, Justice**

**Topic Index for** _Markstadt v. Lockheed Martin Corp._**, Nos.31,258/31,447**

| | |
|---|---|
| **AE** | **APPEAL AND ERROR** |
| AE-CT | Certification |
| AE-RM | Remand |
| | |
| **CN** | **CONTRACTS** |
| CN-CG | Contracts, General |
| CN-TB | Third Party Beneficiary |
| | |
| **JM** | **JUDGMENT** |
| JM-SJ | Summary Judgment |
| | |
| **IN** | **INSURANCE** |
| IN-IC | Insurance Contract |
| IN-ID | Insurance Code |
| IN-RI | Regulation or Insurance |
| IN-MV | Motor Vehicle Insurance |
| IN-UM | Uninsured or Underinsured Motorist |
| | |
| **ST** | **STATUTES** |
| ST-IP | Interpretation |