# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: <u>June 28, 2017</u>

**NO. 34,897**

**BETTY E. ULLMAN, for herself and others similarly situated,**

      Plaintiff-Appellee,

v.

**SAFEWAY INSURANCE COMPANY,**

      Defendant-Appellant,

and

**RICHARD BAILEY,**

      Defendant.

**INTERLOCUTORY APPEAL FROM THE DISTRICT COURT OF SANTA FE COUNTY**
**Francis J. Mathew, District Judge**

Law Offices of Geoffrey R. Romero
Geoffrey R. Romero
Albuquerque, NM

Garcia Ives Nowara, LLC
Matthew L. Garcia
Albuquerque, NM

Freedman, Boyd, Hollander, Goldberg, Urias & Ward, P.A.
Joseph Goldberg
David A. Freedman
Vincent J. Ward
Albuquerque, NM

Vargas Law Firm, LLC
Ray M. Vargas, II
Albuquerque, NM

O'Connell Law LLC
Erin B. O'Connell
Albuquerque, NM

for Appellees

Butt, Thornton & Baehr, P.C.
Rheba Rutkowski
James H. Johansen
Albuquerque, NM

for Appellant

**OPINION**

**SUTIN, Judge.**

{1}     This matter comes to us on interlocutory appeal from the denial of Safeway Insurance Company's motion for summary judgment seeking dismissal of class action claims. Safeway sought to prove that its insurance documents were legally adequate to support its rejections of claims of class members to uninsured and underinsured motorist (UM/UIM) benefits. The district court certified that the case involved "a controlling question of law as to which there is [a] substantial . . . difference of opinion and that an immediate appeal . . . may materially advance the ultimate termination of the litigation." The court identified that controlling question as "whether Safeway has complied with New Mexico law in obtaining waivers of [UM/UIM] coverage insurance, including stacked coverage, from its insureds."

{2}     Safeway asks this Court to (1) rule that Safeway obtained valid rejections of UM/UIM coverage in compliance with New Mexico law; (2) reverse the order denying Safeway's class-related motion for summary judgment; and (3) remand with instructions to dismiss the class claims with prejudice and de-certify the class because "a ruling on the certified question in Safeway's favor means that the alleged violation of law that grounds the class definition and class claims does not exist, leaving no common question appropriate for class litigation." We hold that Safeway obtained

valid rejections of UM/UIM coverage in compliance with New Mexico law. We further hold that, on remand, the district court is to address any remaining class-related issues or concerns.

**I.    THE CLASS**

{3}    In pursuit of class certification in an action against Safeway, Plaintiff Betty E. Ullman stated the certified class to be:

> All New Mexico residents, who are all Safeway policyholders or insureds under any Safeway policy issued, or reissued, in New Mexico where that Safeway policy did not provide the maximum amount of [UM/UIM] coverage allowed by law and for which Safeway did not obtain a valid waiver/rejection of UM/UIM coverage with limits equal to the limits of liability coverage. An invalid waiver/rejection of UM/UIM coverage is one which did not include an offer of UM/UIM limits up to the liability limits and a disclosure of premium amount for each available level of coverage, including stacked coverage.

Ullman's claims and the class membership are based on Ullman's assertion of legally inadequate Safeway UM/UIM documentation affecting all policyholders in the class.

**II.    STANDARD OF REVIEW**

{4}    In the district court, Ullman argued that the issue was whether Safeway's uniform documentary language complied with New Mexico law, and for that reason, the particular circumstances surrounding an ultimate rejection, including the means in which the rejection was obtained, were immaterial. Whether the documents met the legal requirements for offering and obtaining waivers of UM/UIM coverage and for

2

stacking of benefits is a legal question resolved by interpretation of applicable statutory, regulatory, and case law, calling for de novo review. *See Marckstadt v. Lockheed Martin Corp.*, 2010-NMSC-001, ¶ 13, 147 N.M. 678, 228 P.3d 462; *Wilkeson v. State Farm Mut. Auto Ins. Co.*, 2014-NMCA-077, ¶ 6, 329 P.3d 749.

{5}     The question whether language in a document *meaningfully* informs a customer regarding the insurance offered requires this Court "to consider legal concepts in the mix of fact and law and to exercise judgment about the values that animate legal principles[.]" *State v. Attaway*, 1994-NMSC-011, ¶ 6, 117 N.M. 141, 870 P.2d 103 (internal quotation marks and citation omitted). Like the concept of reasonableness, the concept of meaningful involves the exercise of reasoned and evaluative judgment as to concepts inherently factual yet in need of appellate court de novo review. *See id.* ¶ 9 (discussing "rules and tests, based as they are on careful balancing of the underlying constitutional values," serving as "a proxy for reasonableness, generally applicable, but inherently factual[,]" yet "extend[ing] beyond fact-finding and implicat[ing] an assessment of broader legal policies . . . entrust[ed] to the reasoned judgment of the appellate courts of this state"); Randall H. Warner, *All Mixed Up About Mixed Questions*, 7 J. App. Prac. & Process, No. 1, at 129 (Spring 2005) ("[E]valuative determinations involve the judging of a person's conduct or belief. This is typically done by applying a standard like 'reasonable' or 'fair' that conveys

3

to the decision-maker that he or she is judging according to a community standard."). In such instances, appellate courts are free to conclude that, as a matter of policy, the issue should be reviewed de novo in the interests of judicial administration. *Attaway*, 1994-NMSC-011, ¶¶ 6-8; Warner, *supra*, at 109-12, 118, 130-31. Thus, it is for this Court to determine whether the documents were legally adequate to meaningfully inform Ullman of required insurance information. For the purposes of our de novo review, it is to be understood that Ullman received the critical documents.

## III.   THE LEGAL REQUIREMENTS

## A.   UM/UIM Coverage and Rejection of Coverage

{6}    UM/UIM coverage and rejection of coverage are subjects of NMSA 1978, Section 66-5-301 (1983), and its implementing regulation, 13.12.3.9 NMAC. Section 66-5-301 reads:

> A.    No motor vehicle or automobile liability policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person and for injury to or destruction of property of others arising out of the ownership, maintenance or use of a motor vehicle shall be delivered or issued for delivery in New Mexico with respect to any motor vehicle registered or principally garaged in New Mexico unless coverage is provided therein or supplemental thereto in minimum limits for bodily injury or death and for injury to or destruction of property as set forth in Section 66-5-215 NMSA 1978 and such higher limits as may be desired by the insured, but up to the limits of liability specified in bodily injury and property damage liability provisions of the insured's policy, for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness

4

or disease, including death, and for injury to or destruction of property resulting therefrom, according to the rules and regulations promulgated by, and under provisions filed with and approved by, the superintendent of insurance.

B. The uninsured motorist coverage described in Subsection A of this section shall include underinsured motorist coverage for persons protected by an insured's policy. For the purposes of this subsection, "underinsured motorist" means an operator of a motor vehicle with respect to the ownership, maintenance or use of which the sum of the limits of liability under all bodily injury liability insurance applicable at the time of the accident is less than the limits of liability under the insured's uninsured motorist coverage. . . .

C. The uninsured motorist coverage shall provide an exclusion of not more than the first two hundred fifty dollars ($250) of loss resulting from injury to or destruction of property of the insured in any one accident. The named insured shall have the right to reject uninsured motorist coverage as described in Subsections A and B of this section; provided that unless the named insured requests such coverage in writing, such coverage need not be provided in or supplemental to a renewal policy where the named insured has rejected the coverage in connection with a policy previously issued to him by the same insurer.

The regulation states: "The rejection of the provisions covering damage caused by an uninsured . . . motor vehicle as required in writing by the provisions of Section 66-5-301 . . . must be endorsed, attached, stamped or otherwise made a part of the policy of bodily injury and property damage insurance." 13.12.3.9 NMAC; *see Romero v. Dairyland Ins. Co.*, 1990-NMSC-111, ¶ 8, 111 N.M. 154, 803 P.2d 243 ("An insured may reject [UM] coverage, but the rejection must satisfy the regulations promulgated by the superintendent of insurance.").

5

{7} In *Montano v. Allstate Indemnity Co.*, 2004-NMSC-020, ¶¶ 17, 20, 135 N.M. 681, 92 P.3d 1255, our Supreme Court charted a "new course" in UM/UIM law, which, among other rulings, required insurers in multiple-vehicle policies to "declare the premium charge for each of the . . . coverages" as a means of ensuring that consumers get what they pay for. In *Progressive Northwestern Insurance Co. v. Weed Warrior Services*, 2010-NMSC-050, ¶¶ 8, 14-15, 149 N.M. 157, 245 P.3d 1209, our Supreme Court required that insurers offer UM/UIM coverage that includes "the maximum amount statutorily available" equal "to the liability limits of the policy[.]" Further, the Court explained the insured's choice to purchase any lower amount functions as a rejection of that maximum amount of coverage statutorily possible. *Id.* ¶ 14.

{8} With respect to obtaining valid rejections of UM/UIM coverage, several New Mexico Supreme Court cases have stated what constitutes compliance, starting with *Romero*, 1990-NMSC-111, and then later *Marckstadt*, 2010-NMSC-001, and *Jordan v. Allstate Insurance Co.*, 2010-NMSC-051, 149 N.M. 162, 245 P.3d 1214. *Romero* explained that "[t]he rejection must be made a part of the policy by endorsement on the declarations sheet, by attachment of the written rejection to the policy, or by some other means that makes the rejection a part of the policy so as to clearly and unambiguously call to the attention of the insured the fact that such coverage has

6

been waited." 1990-NMSC-111, ¶ 8. Further, under *Romero*, "[p]roviding affirmative evidence of the rejection of the coverage comports with a policy that any rejection of the coverage be knowingly and intelligently made." *Id.* ¶ 9. And UM/UIM coverage will be read into the policy "when a rejection of such coverage does not comply with [the] regulation[]." *Id.*

{9}     In *Marckstadt*, our Supreme Court clarified that "an insurer must obtain a written rejection of UM/UIM coverage . . . in order to exclude it[,]" but that "neither the statute nor the regulation requires that the insured's written rejection be signed[,]" and "the written rejection itself need not be made part of the policy." 2010-NMSC-001, ¶ 4; *see id.* ¶¶ 23-26, 32. The Court further clarified that "the rejection which the regulation requires to be in writing must be the *act* of rejection described in the statute and not the *evidence* of that act mandated by the regulation itself." *Id.* ¶ 22. *Marckstadt* explained that this requirement assures "that the insured is sufficiently informed before rejecting coverage, alerting the insured to the importance of the decision, and providing clear evidence of a decision to reject[.]" *Id.* ¶ 21. The *Marckstadt* Court stated, "[W]e cannot hold that the regulation may only be satisfied by the attachment of the written rejection provided to the insurer by the insured[,]" *id.* ¶ 25, and that "other forms of notification could function equally well to clearly and unambiguously call to the attention of the insured the fact that such coverage has

been waived." *Id.* (internal quotation marks and citation omitted). In sum, under *Marckstadt*, "the insurer must obtain a written rejection from the insured, . . . the written rejection need not be signed or attached to the policy[,]" and the regulation "requires that some evidence of the insured's written rejection of UM/UIM coverage must be made part of the policy by endorsement, attachment, or some other means that calls the insured's attention to the fact that such coverage has been waived." *Id.* ¶ 26.

{10} Almost a year after *Marckstadt*, *Jordan* decided that the "Court's repeated pronouncements" in *Marckstadt* and *Romero*, "indicate[d] that insurers continue[d] to offer UM/UIM coverage in ways that are not conducive to allowing the insured to make a realistically informed choice." *Jordan*, 2010-NMSC-051, ¶ 20. The Court therefore proceeded to "prescribe workable requirements for a valid and meaningful rejection of UM/UIM coverage in amounts authorized by statute." *Id.* The Court stated:

> When issuing an insurance policy, an insurer must inform the insured that he or she is entitled to purchase UM/UIM coverage in an amount equal to the policy's liability limits and must also provide the corresponding premium charge for that maximum amount of UM/UIM coverage. The premium cost for the minimum amount of UM/UIM coverage allowed by Section 66-5-301(A) must also be provided, as well as the relative costs for any other levels of UM/UIM coverage offered to the insured. The insured must be informed that he or she has a right to reject UM/UIM coverage altogether. Providing the insured with a menu of coverage options and corresponding premium costs will enable

8

the insured to make an informed decision about the level of UM/UIM coverage he or she wants to purchase and can afford and will minimize uncertainty and litigation with regard to the coverage that the insured has obtained.

*Id.* ¶ 21. More recently, in *Whelan v. State Farm Mutual Automobile Insurance Co.*, 2014-NMSC-021, ¶ 25, 329 P.3d 646, our Supreme Court confirmed *Montano*'s having imposed a requirement "that insurers disclose the premium costs for each available level of stacked coverage as a means of guaranteeing that consumers can knowingly exercise their statutory rights to UM/UIM coverage." And *Whelan* further confirmed that "*Jordan* followed *Montano* by requiring similar premium disclosure as to the premium charges corresponding to each available [UM/UIM] option[.]" *Whelan*, 2014-NMSC-021, ¶ 25 (internal quotation marks and citation omitted).

{11}     *Jordan* sets out the consequences stemming from an insurer's failure to abide by the requirements.

If an insurer does not (1) offer the insured UM/UIM coverage equal to his or her liability limits, (2) inform the insured about premium costs corresponding to the available levels of coverage, (3) obtain a written rejection of UM/UIM coverage equal to the liability limits, and (4) incorporate that rejection into the policy in a way that affords the insured a fair opportunity to reconsider the decision to reject, the policy will be reformed to provide UM/UIM coverage equal to the liability limits.

*Jordan*, 2010-NMSC-051, ¶ 22.

9

## B. Stacking

{12} Stacking rules were substantially clarified in *Montano*, 2004-NMSC-020, and were also discussed in *Jordan*, 2010-NMSC-051. *Montano* addressed "whether an insurance company effectively precluded its insured from stacking the policy limits of all of his vehicles insured under the policy for his [UM] claim[,]" where the plaintiff insured four vehicles under a policy, paid a single premium for UM coverage, and limited stacking to two coverage limits. 2004-NMSC-020, ¶¶ 1, 3-4, 6. The plaintiff asked the Court to declare all anti-stacking clauses void as against public policy, and alternatively, that he be permitted to stack four coverage limits under the circumstances. *Id.* ¶ 7. Our Supreme Court did not expand its public policy favoring stacking to require stacking in all cases, stating, "[w]e have always understood stacking to be the remedy for an ambiguous contract or the charging of multiple premiums." *Id.* ¶ 9. And after reviewing prior cases, the Court stated that it had "never held that anti-stacking clauses violate public policy when unambiguous and when only one premium has been charged for the coverage." *Id.* ¶ 15. The Court explained that to declare all anti-stacking clauses void as against public policy

> would expand the public policy in favor of stacking beyond what [the] earlier cases have declared it to be. Our public policy in support of stacking, rather, has always been tied to the notion that it is unfair not to allow stacking *when multiple premiums are paid* or when the policy is otherwise ambiguous. It would thus be an expansion of that policy to also require stacking when the policy clearly only charges a single

10

premium and unambiguously precludes stacking. We decline to modify our case law in order to expand our expression of the public policy underlying stacking.

. . . Further, requiring stacking in all cases on a take-it-or-leave-it basis would reduce the freedom of the parties to contract for less coverage and thus their freedom to decide how much coverage they can afford. This could frustrate, rather than advance, the legislative intent behind the UM statute. . . . [and] . . . result in some lower-income insureds who own multiple vehicles being effectively "priced out" of UM coverage.

*Id.* ¶¶ 15-16.

{13}    Stacking is not a statutorily mandated UM coverage level but "a judicially-created doctrine[.]" *Id.* ¶ 17; *Wilkeson*, 2014-NMCA-077, ¶ 8 ("In New Mexico, stacking is 'a judicially-created doctrine' that has arisen in cases in which our Supreme Court has needed to determine whether insurance policy limitations of liability provisions restrict or permit stacking." (quoting *Montano*, 2004-NMSC-020, ¶ 17). Because the "traditional case-by-case ambiguity analysis has proved unworkable" and "[b]earing in mind that [stacking] is a judicial doctrine," the *Montano* Court determined that a "new approach" was needed "to protect the reasonable expectations of insureds and to ensure that they get what they pay for." 2004-NMSC-020, ¶ 17. Taking "guidance" from a concurrence in an out-of-state decision stating that stacking should be treated as "extra coverage for which the parties have contracted," and also from Section 66-5-301(A) and (C), the Court "discern[ed] a solution to the seemingly inherent ambiguities in anti-stacking clauses:

11

an insurance company should obtain written rejections of stacking in order to limit its liability based on an anti-stacking provision." *Montano*, 2004-NMSC-020, ¶¶ 18-19 (internal quotation marks and citation omitted); *see also Whelan*, 2014-NMSC-021, ¶ 1 (confirming *Montano* as requiring insurers to "obtain explicit written rejections of stacking in order to limit their statutory obligations").

{14}     The Court in *Montano* illustrated its holding:

> [I]n a multiple-vehicle policy insuring three cars, the insurer shall declare the premium charge for each of the three UM coverages and allow the insured to reject, in writing, all or some of the offered coverages. Thus, hypothetically, in the case of a $25,000 policy, if the premium for one UM coverage is $65, two coverages is an additional $60, and three coverages $57 more, the insured who paid all three (for a total premium of $182) would be covered up to $75,000 in UM bodily injury coverage. However, the insured may reject, in writing, the third available coverage and pay $125 for $50,000 of UM coverage; or the insured may reject, in writing, the second and third coverages and pay $65 for $25,000 of UM coverage; or the insured may reject all three UM coverages. In any event, the coverage would not depend on which vehicle, if any, was occupied at the time of the injury. Thus, the insured's expectations will be clear, and an insured will only receive what he or she has paid for.

2004-NMSC-020, ¶ 20. The Court followed with: "In all future cases, an insurance policy that complies with this requirement will avoid the conclusion we now draw from the history of stacking litigation in this State, namely, that anti-stacking clauses are almost inherently ambiguous and are no longer effective at precluding stacking. With written waivers, insureds will know exactly what coverage they are receiving

and for what cost[.]" *Id.* ¶ 21. Having "set forth the policy language requirements for future stacking cases," the Court relied on its "traditional ambiguity analysis" to resolve the case, reasoning that "it would be inequitable to apply [the new requirements] against [the insurer] before it has had an opportunity to alter its policy language[.]" *Id.* ¶ 22. Applying that analysis, the Court held that the plaintiff was "entitled to stack his four coverages" because the policy did not meet the requirements "for a truly unambiguous policy[.]" *Id.* ¶¶ 27-28.

{15}    In regard to the phrase "rejections of stacking" in *Montano*, as we state later in this opinion, because an insurer has no duty to offer or explain stacking to a customer, we construe the phrase "rejections of stacking" to mean rejection of UM/UIM coverage which, if valid, necessarily precludes court-imposed stacking.[1] *Id.*

---

[1] This Court's opinion in *Arias v. Phoenix Indemnity Insurance Co.*, 2014-NMCA-027, ___P.3d___, appears to discuss rejection of coverage and rejection of stacking as two different concepts, but the Court ultimately and correctly concluded that absent a valid rejection of UM/UIM coverage as to multiple vehicles, the law "demands stacking of coverage[.]" *Id.* ¶ 15. We stated:

> Having extended . . . the availability of UM/UIM coverage as a matter of law, we also include per-vehicle stacking. We believe that, in the absence of a rejection of coverage altogether, the coverage that must be extended is the full measure accorded [the plaintiff] by the default positions afforded by law. This includes UM/UIM coverage generally, specifically to be stacked as to each of [the] insured vehicles.

*Id.*

¶ 19. Thus, where stacking is not otherwise lawfully precluded, UM/UIM *coverages* that have not been rejected can be stacked. There exists no required express *stacking* rejection independent of *coverage* rejection.

## IV. SAFEWAY'S DOCUMENTS RELATING TO UM/UIM COVERAGES AND REJECTION OF COVERAGES

{16}    Several documents used in Ullman's insurance purchase appear in the record. Safeway's documents include the following forms: Application, Selection/Rejection, Endorsement Page, Declarations Page, and the standard form policy. Also in the record are insurance agency forms used by the insurance agency in the process of contracting for the insurance with Ullman. The parties agree that the critical and operative documents on the issue of legal adequacy are the Safeway documents and that the agency's documents are not relevant on the issue of legal adequacy. We nevertheless set out the agency's documents that were signed by Ullman so that the reader has a full understanding of what Ullman had before her.

### A. New Mexico Automobile Insurance Application

{17}    Ullman signed a New Mexico Automobile Insurance Application form on November 12, 2011. The application asks the insured to "please read" certain matters set out in the application, one of which reads, in part, "I understand that I have only the coverages indicated in Section 5. All of the coverages shown in Section 5 have been explained. I understand the various coverages and that I have only those

14

coverage [sic] which have been completed. I have rejected all coverages not completed in Section 5." Under Section 5, "Coverages," the document states, "No coverage unless checked or premium shown[.]" The application shows bodily injury limits of $25,000/$50,000 for each insured vehicle, listing the premium amount of $79.00 for each. And the application has a location for the limits and premiums for UM/UIM coverage, as to which each vehicle shows "rejected." Ullman signed the completed application on November 12, 2011.

**B.     UM/UIM Coverage Selection/Rejection Form**

{18}     Ullman signed an "Uninsured/Underinsured Motorist Coverage Selection/Rejection Form" on November 12, 2011. This selection/rejection form at the outset informs the insured of the following:

> New Mexico [l]aw requires that all policies provide [UM/UIM] Coverage of at least $25,000 per person, $50,000 per accident, and [UM] Property Damages . . . limits of at least $10,000 unless you specifically reject such coverage in writing. [UM] Coverage provides that if you suffer bodily injury or sickness including death, resulting from an accident with a person who does not carry liability insurance, and that driver is at fault, you may make a claim against your own insurance company for general and special damages. [UIM] Coverage protects you from a driver who has insurance, but in an amount less than your [UM] Coverage.
>
> You have a right to purchase [UM/UIM] coverage in an amount up to your policy's liability limit, or you may reject the coverage entirely. The limit may not exceed your liability coverage limits. If you make no UM/UIM choices below, you will receive UM/UIM at the liability limits shown on your policy declarations.

15

The selection/rejection form gave Ullman the opportunity to purchase UM/UIM coverage at the bodily injury limits or to reject that coverage. The document has blank spaces for selection of bodily injury limits in a certain coverage amount that correlate with the available UM/UIM coverage option for a particular total premium cost per vehicle. That is, immediately below the first two advisory provisions, the form has a place for insertion of the bodily injury limits chosen by the insured, with an additional location for insertion of the corresponding available UM/UIM coverage option chosen for the policy, including the total premium cost per vehicle. The bodily injury limit chosen by Ullman was shown to be $25,000/$50,000, and the available UM/UIM coverage option was shown to be $25,000/$50,000 per person/per occurrence, with a total premium cost for the UM/UIM available option of $52.00, or $0.29 per day, per vehicle.

{19} Different, separate options then appear on the selection/rejection form in regard to UM/UIM coverage for the insured to consider and choose by marking the choice with an "X" on a blank line. Those options relating to each insured vehicle are:

I wish to purchase UM/UIM Coverage in the amount of $25,000/50,000.

. . . .

I wish to REJECT UM/UIM . . . Coverage[] entirely and understand that my policy will not contain [this] Coverage[].

16

The first option set out above has no "X" placed in the blank spaces for her two vehicles. Instead, an "X" appears for each of Ullman's vehicles with respect to her "wish to REJECT UM/UIM . . . Coverage[] entirely and understand[ing] that [her] policy will not contain [that] Coverage[]."

{20} The selection/rejection form ends just before the signature line with the following:

> I understand and agree that selection of any of the options indicated above shall apply on this policy and on all future renewals of such policy, and on all endorsements because of a change in vehicle or coverage, or because of an interruption of coverage. If I decide to select another option at some future time, I must notify the Company in writing.
>
> **MUST BE SIGNED.** DO NOT SIGN UNTIL YOU HAVE READ AND UNDERSTOOD YOUR SELECTIONS.

Ullman signed this completed form on November 12, 2011.

## C. Declaration Page/Renewal Certificate

{21} A Declaration Page/Renewal Certificate form shows that it was processed on November 12, 2011. This declaration page has a location to show the insured's bodily injury limits and premiums for each insured vehicle, as well as spacing for the insured's limits and premiums for UM coverage if that coverage were selected for either vehicle. The form also tells the insured to "[k]eep [the form] in your car at all times as proof of your insurance." The declaration page shows "rejected" under UM

17

bodily injury coverage. This information is preceded by the statement, "Coverage is provided where a Limit of Liability and a Premium are indicated." The form states that "THE ENTIRE POLICY CONTRACT INCLUDES THIS DOCUMENT, THE APPLICATION, THE POLICY AND ANY ENDORSEMENTS."

**D.      Endorsement Page of Personal Automobile Insurance Policy**

{22}      The effective date of the Endorsement Page of Personal Automobile Insurance Policy is shown as January 4, 2012. This endorsement page is virtually identical to the declarations page. It states that it is "[a]ttached to and forming part of [the Ullman] policy[.]" Different from the declarations page, the bodily injury premiums are not shown, and nothing is shown in the UM bodily injury coverage for either vehicle. The form also states that "THE ENTIRE POLICY CONTRACT INCLUDES THIS DOCUMENT, THE APPLICATION, THE POLICY AND ANY ENDORSEMENTS."

**E.      New Mexico Automobile Policy**

{23}      The New Mexico Automobile Policy indicates that it is an April 1, 2009 form. The policy states that its provisions "WITH THE APPLICATION, DECLARATIONS PAGE AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THIS POLICY." Under "INSURING AGREEMENT," the policy states:

> For the **policyholder's** payment of premiums and fees in amounts we require and subject to all of the terms and conditions of this policy, **we**

18

agree to provide the coverages the **policyholder** has selected. These selections are shown in the enclosed Declarations, which are a part of this policy contract. The selected coverages in this policy apply only to occurrences while this policy is in force. Renewal premiums must be paid in advance.

The policy has a section titled "UNINSURED MOTORISTS" that sets out the parties' "Coverage Agreement." Under "Limits and Conditions of Payment Amounts Payable for Uninsured Motorists Losses," the policy states, "Our obligation to pay Uninsured Motorists—**Bodily Injury** losses is limited to the amounts per person and per occurrence in the Declarations."

## V.     THE AGENCY'S DOCUMENTS

## A.     Automobile Coverage Form

{24}     An "Automobile Coverage Form" provides for bodily injury liability insurance and UM/UIM insurance limits selected or not selected by the insured. This form shows the liability limits choices of "BI–$25k/50k, $50k/100k, $100k/300k, Other" and separately lists the same choices for UM limits. Liability limits designated "BI–$25k/50k" is circled, and nothing is circled for UM limits. Ullman signed this document on November 12, 2011.

**B.      Albuquerque Insurance World, Inc. "Dear Customer" Reminder**

{25}     An Albuquerque Insurance World, Inc. "Dear Customer" form instructs the insured to "carefully" review the form, "ask questions on anything" the insured does not "completely understand," and then sign. The document states the following as two of sixteen items the insured is to read: "3. IS THE COVERAGE WHAT *YOU* ORDERED AND IN THE AMOUNTS *YOU* ORDERED?" and "4. IF YOU REJECTED [UM] COVERAGE, ARE YOU CLEAR ON HOW THE COVERAGE WOULD HAVE BENEFITED YOU? *WE STRONGLY RECOMMEND THIS COVERAGE.*" Above the signature, the form states, "I HAVE READ EACH ITEM ABOVE AND UNDERSTAND HOW EACH ONE AFFECTS ME. I AM ALSO RECEIVING A COPY OF THIS FORM FOR MY RECORDS." Ullman signed this document on November 12, 2011.

**C.      "Dear Insured" Reminder**

{26}     A "Dear Insured" form tells the insured, among other things, that "It is important that you obtain your policy in the mail and review it to be sure all drivers, vehicles, and coverages that you desire to be included on your policy are included. If you do not receive your policy please call us." Ullman signed this document on November 12, 2011.

## VI.   ULLMAN'S VIEWS

### A.   Contentions as to Genuine Issues of Material Fact

{27}   Ullman contends in her answer brief that, in denying Safeway's motion for summary judgment, the district court did not decide whether the forms were legal but instead denied the motion for summary judgment because of genuine issues of material fact. She further states that a factual basis existed for a jury to find that Safeway did not properly inform insureds about premium costs corresponding to available levels of coverage, did not assess whether Safeway advised Ullman and similarly situated insureds of the maximum UM/UIM coverage available, and did not properly incorporate rejection of UM/UIM coverage into her policy. And she explains that "a jury has not rendered any factual findings as to whether Safeway violated its legal obligations to its insureds." Ullman further points out that discovery should be allowed to proceed in the district court as to what documents Ullman received or did not receive. And she raises the question whether rejection was called to the attention of the insured, citing *Arias v. Phoenix Indemnity Insurance Co.*, 2009-NMCA-100, ¶ 13, 147 N.M. 14, 216 P.3d 264, which cites to *Romero*, 1990-NMSC-111, ¶ 8, as having emphasized an insurer's need to clearly and unambiguously call the rejection to the insured's attention.

**B.     Contentions as to UM/UIM Coverages**

{28}     In her answer brief, Ullman argues: (1) that Safeway's policy had no language advising her of the "full range of options in purchasing UM/UIM coverage and the corresponding costs associated with each option"; (2) that Safeway's "rejection form and endorsements did not advise an insured of the extent or maximum amount of UM/UIM coverage being offered, and did not advise of the costs corresponding to the available coverages"; (3) that Safeway's "purported rejection was not attached, endorsed, stamped or otherwise made a part of the policy, as required by law, where the endorsement does not advise the insured that UM/UIM coverage has been rejected"; (4) that Ullman's purported rejection was not incorporated into her policy "in a manner that called attention to the fact that she was not receiving the benefits of UM/UIM coverage"; (5) that no evidence was provided to Ullman of a "rejection by endorsement, attachment, or some other means that calls the insured's attention to the fact that UM/UIM coverage has been waived"; and (6) that Safeway's endorsement page and policy booklet, which consisted of the "limited information . . . provided to . . . Ullman, . . . say[] nothing as to whether . . . Ullman was offered or rejected any UM/UIM coverage."

22

**C.    Contentions as to Stacking**

{29}    Ullman contends in her answer brief that Safeway's "policy language provided [her] with no meaningful explanation that in purchasing liability coverage she was entitled to purchase stacked (or aggregated) coverage[,]" and "[t]o the contrary, and contrary to New Mexico law, [Safeway's] policy specifically advises insureds that stacking of UM/UIM coverage is never available regardless of the number of vehicles insured." She argues that, under *Montano*, insurers cannot exclude stacked UM/UIM coverage from a policy unless the insurer obtains a written waiver/rejection of stacking.

{30}    Ullman states that the New Mexico-specific application Safeway provides to its insureds states that if the insured selected UM/UIM coverage "there will be no stacking or combining of coverage afforded to more than one auto under [the] policy[,]" specifically quoting a form that does not appear to be one that was used in Ullman's purchase. Ullman further states that the policy booklet misrepresents stacked coverage by asserting that stacked UM/UIM coverage is never available on a multi-vehicle policy.

{31}    Ullman argues that Safeway "exacerbates" the stacking-related deficiency by its general failure "to provide any information regarding the maximum amount of UM/UIM coverage available on the two vehicles under her policy." She spends a

23

significant part of her answer brief discussing stacking, as though it is her primary contention.

**VII.   SAFEWAY'S VIEWS**

{32}    In showing that its documentation complies with New Mexico law, Safeway takes pains to set out what each document states. Having set out earlier in this opinion what the relevant documents show and state, we see no reason to further discuss Safeway's descriptions. Stacking, however, needs to be discussed.

{33}    Safeway asserts that *Montano* "plainly did not declare anti-stacking language illegal, let alone even suggest that insureds have a right to stack coverages in every circumstance." *See Rodriguez v. Windsor Ins. Co.*, 1994-NMSC-075, ¶ 21, 118 N.M. 127, 879 P.2d 759 ("We do not declare that it is impossible for an insurance company to issue [UM] coverage that is immune to stacking."), *modified on other grounds by Montano*, 2004-NMSC-020, ¶ 1. Safeway states that there exists "no requirement to explain stacking law, much less advise the insured of a per se entitlement to stack separate coverages in every circumstance." Safeway adds the following:

> *Jordan* adopted *Montano*'s "menu" in its requirements for offering and obtaining waivers of UM coverage. [*Jordan*,] 2010-NMSC-051, ¶ 24. But it required no more than that the insurer declare each level of statutorily available UM coverage and corresponding premium. *Id.* ¶ 2 (requiring "a rejection of UM/UIM coverage equal to the liability limits" and that "insurers must provide the insured with the premium charges corresponding to each available option for UM/UIM coverage so that the insured can make a knowing and intelligent decision to

24

receive or reject the full amount of coverage to which the insured is statutorily entitled"); *id.* ¶ 20 (stating "workable requirements for a valid and meaningful rejection of UM/UIM coverage in amounts authorized by statute"); *id.* ¶ 21 ("[A]n insurer must inform the insured that he or she is entitled to purchase UM/UIM coverage in an amount equal to the policy's liability limits and must also provide the corresponding premium charge for that maximum amount of UM/UIM coverage"); *id.*[] ¶ 22 ("[I]nsurers have statutory obligations to offer UM/UIM coverage up to the liability limits of the policy"); *id.* ¶¶ 25, 30; *see Progressive*, 2010-NMSC-050, ¶¶ 8, 14-15.

{34} Safeway finds support in holdings in the United States District Court for the District of New Mexico and the Tenth Circuit Court of Appeals rejecting the argument such as that made by Ullman "that a rejection of UM coverage is invalid under New Mexico law unless the rejection form contains an explanation of stacking and a calculation of total coverage amounts if statutorily available UM coverage levels were stacked." *See Jaramillo v. Gov't Emps. Ins. Co.*, No. 12-2108, 573 F. App'x 733 (10th Cir. 2014) (non-precedential).[2]

{35} Safeway points out that the *Jaramillo* complaint was filed as a putative class action, with allegations substantially similar to those made here. *See id.* at 737. The insurers moved for summary judgment, arguing that the insureds' written rejection of UM/UIM coverage complied with New Mexico law, and because all of the claims "stemmed from an allegedly improper denial of UM/UIM benefits, the complaint was

---

[2] "Unpublished decisions are not precedential, but may be cited for their persuasive value." 10th Cir. R. 32.1(A); Fed. R. App. P. 32.1.

25

not viable." *Id.* (emphasis omitted). The district court granted the insurers' motion. *Id.* The court determined that the rejection form "clearly offered the opportunity to select UM/UIM coverage in an amount equal to or lower than those selected bodily injury liability limits while also providing premium costs corresponding to each level of coverage" and that the insurers had incorporated the rejection into the policy. *Id.* (internal quotation marks and citation omitted). In denying the insureds' motion to reconsider, the district court reaffirmed its view that the insurers' form complied with New Mexico law as articulated in *Jordan*. *Jaramillo*, 573 F. App'x at 737-38.

{36} The plaintiffs argued on appeal to the Tenth Circuit Court of Appeals that the insurers' "offer of UM/UIM coverage was invalid for failure to make clear the amount of stacked UM/UIM coverage available . . . or the corresponding cost of such coverage." *Id.* at 739 (omission in original) (internal quotation marks omitted). The Tenth Circuit saw this argument as dovetailing into the question "whether the district court erred in holding that under New Mexico law, an insurer is not required to inform the insured about premium costs corresponding to each available level of stacked UM/UIM coverage." *Id.* (alteration, internal quotations marks, and citation omitted). Addressing whether the insurance form was "invalid as a matter of law because it lacks a discussion or explanation of stacked UM/UIM coverage[,]" the

26

Tenth Circuit affirmed the district court's conclusion that the form and coverage rejection satisfied New Mexico law. *Id.*

{37} Further, the Tenth Circuit rejected the insureds' argument that the insurers' "Option Form" was invalid "because it does not flesh out the nuances of stacked UM/UIM coverage" as a "strained reading" of *Jordan* and *Montano*, neither of which required that UM/UIM rejection forms must explain stacking. *Jaramillo*, 573 F. App'x at 741-42, n.7. *Jaramillo* explained that *Montano*'s "core holding" was that " 'an insurance company should obtain written rejections of stacking *in order to limit its liability based on an anti-stacking provision*' in a policy." *Jaramillo*, 573 F. App'x at 742 (quoting *Montano*, 2004-NMSC-020, ¶ 19). And *Jaramillo* stated that *Jordan* "did not comment on the question of stacking, and it did not explicitly forge a nexus between the new standard that it announced and the concept of stacking." *Jaramillo*, 573 F. App'x at 743. Thus, rejecting the insureds' treatment of "maximum amount of coverage" and "maximum stacked amount of coverage" as "fungible concepts," *Jaramillo* explained that "*Jordan* makes clear that the 'maximum amount' contemplated is simply an amount equal to the policy's liability limits," and the court declined "to graft the crucial word 'stacked' onto its holding." *Jaramillo*, 573 F. App'x at 744 n.9 (citing *Jordan*, 2010-NMSC-051, ¶ 21).

27

**{38}** *Jaramillo* further explained that *Jordan* required insurers to provide only the " 'premium charge for the maximum amount of UM/UIM coverage' (the maximum amount being 'an amount equal to the policy's liability limits') as well as the 'premium cost for the minimum amount of UM/UIM coverage allowed by Section 66-5-301(A),' and 'the relative costs for any other levels of UM/UIM coverage offered to the insured'—*viz.*, the costs for a *range* of coverage between the minimum and maximum amounts." *Jaramillo*, 573 F. App'x at 744 (alteration and footnote omitted) (quoting *Jordan*, 2010-NMSC-051, ¶ 21). *Jaramillo* concluded that "*Montano* does not stand for the proposition that the Option Form could only have been valid under New Mexico law if it had specifically mentioned the concept and effect of stacking coverage[,]" and further that "*Jordan* does not mandate—either explicitly or implicitly—that a rejection of UM/UIM coverage equal to a policy's liability limits is invalid without a 'discussion' or 'explanation' of stacking principles." *Jaramillo*, 573 F. App'x at 746-47. *Jaramillo* also concluded that the insureds' "rejection of UM/UIM insurance could not have been invalid under New Mexico law simply because the Option Form did not tally up the stacked coverage amounts for the [insureds'] four vehicles—in other words, because it did not multiply each available level of coverage by four." *Id.* at 748.

# VIII. SETTING UM/UIM REQUIREMENTS AGAINST THE DOCUMENTS

{39}    This discussion sets the New Mexico legal requirements relating to UM/UIM coverage and rejection against Safeway's documents.

## A.    Requirements: An Insurer Must Inform Its Insured That the Insured Is Entitled to Purchase the Maximum Amount of UM/UIM Coverage Statutorily Available; An Insurer Must *Meaningfully* Offer Its Insured the Same

{40}    In *Progressive,* our Supreme Court required that insurers: (1) " 'meaningfully offer' the maximum amount of UM/UIM coverage permitted by the statute, e.g., the liability limits of the policy"; (2) offer UM/UIM coverage that includes "the maximum amount statutorily available . . . [in an amount equal] to the liability limits of the policy"; and (3) after such an offer is made, the insured's choice "to purchase any lower amount functions as a rejection of that maximum amount of coverage statutorily possible." 2010-NMSC-050, ¶¶ 8, 14-15.

{41}    Further, *Jordan*'s prescribed "workable requirements" set out earlier in this opinion are to be repeated, with emphasis on particular language. *See* 2010-NMSC-051, ¶ 20.

> When issuing an insurance policy, an insurer must inform the insured that he or she is entitled to purchase UM/UIM coverage in an amount equal to the policy's liability limits and must also provide the corresponding premium charge for *that maximum amount* of UM/UIM coverage. The premium cost for the *minimum amount* of UM/UIM coverage allowed by Section 66-5-301(A) must also be provided, as well as the relative costs *for any other levels* of UM/UIM coverage offered

29

to the insured. The insured must be informed that he or she has a right to reject UM/UIM coverage altogether. Providing the insured with a menu of coverage options and corresponding premium costs will enable the insured to make an informed decision about *the level* of UM/UIM coverage he or she wants to purchase and can afford and will minimize uncertainty and litigation with regard to the coverage that the insured has obtained.

*Id.* ¶ 21 (emphasis added).

{42}    Ullman interprets "maximum amount" in stacking terms, that is, Ullman argues that Safeway "exacerbates" the stacking-related deficiency by its general failure to provide meaningful information "regarding the maximum amount of UM/UIM coverage available on the two vehicles under her policy." Ullman complains that she is unable to "understand that if she chooses UM/UIM coverage in the amount of $25,000 per person and $50,000 per accident on each of her two vehicles[,]" under stacking, she would have "$50,000 per person and $100,000 per accident in available UM/UIM coverage." We reject Ullman's interpretation as not in accord with *Jordan*'s prescription.

{43}    We agree with the analysis in *Jaramillo* that "*Jordan* makes clear that the maximum amount contemplated is simply an amount equal to the policy's liability limits." *Jaramillo*, 573 F. App'x at 744 n.9 (internal quotation marks omitted) (citing *Jordan*, 2010-NMSC-051, ¶ 21). Further, we agree with *Jaramillo* that *Jordan* requires insurers to provide only the " 'premium charge of the maximum amount of

UM/UIM coverage' (the maximum amount being 'an amount equal to the policy's liability limits')"; "the 'premium cost for the minimum amount of UM/UIM coverage allowed by Section 66-5-301(A)' "; and " 'the relative costs for any other levels of UM/UIM coverage offered to the insured'—*viz.*, the costs for a range of coverage between the minimum and maximum amounts." *Jaramillo*, 573 F. App'x at 744 (footnote omitted) (quoting *Jordan*, 2010-NMSC-051, ¶ 21). As highlighted by Safeway, Ullman misreads *Jaramillo*'s (and thus *Jordan*'s) wording of "*that* maximum amount" by stating "*the* maximum amount." "[*T*]*hat* maximum amount" plainly refers to "UM/UIM coverage in an amount equal to the policy's liability limits[.]" *Jordan*, 2010-NMSC-051, ¶ 21; *see Jaramillo*, 573 F. App'x at 744 & n.9. As in *Jaramillo*, we will not graft stacking onto our view of *Jordan*.

{44}     After setting out the New Mexico requirement that insurers offer UM/UIM coverage, the selection/rejection form explains to the insured: "You have a right to purchase [UM/UIM] coverage in an amount up to your policy's liability limit, or you may reject the coverage entirely. The limit may not exceed your liability coverage limits. If you make no UM/UIM choices below, you will receive UM/UIM at the liability limits shown on your policy declarations." The declaration page shows the bodily injury limits Ullman chose and the premiums for those limits as to each insured vehicle. It further shows that Ullman rejected UM coverage. We hold that

Safeway complied with the UM/UIM legal requirement as to maximum insurance. Ullman was sufficiently made aware of the maximum amount statutorily available.

**B.** **Requirements: An Insurer Must Inform Its Insured About the Premium Costs Corresponding to All Available Levels of Coverage; An Insurer Must Provide Its Insured With a Menu of Options and Corresponding Premium Costs That Will Enable the Insured to Make an *Informed Decision* About the Level of UM/UIM Coverage the Insured Wants to Purchase and Can Afford**

{45}    The Safeway documents show that Ullman chose a $25,000/50,000 level of bodily injury coverage, thereby limiting her to a $25,000/50,000 level of UM/UIM coverage. Safeway was obligated to provide the premium cost for these levels of coverage. *See Jordan*, 2010-NMSC-051, ¶¶ 21-22. The premium cost for the bodily injury level of coverage appeared in the application and the declaration page. The premium cost for the UM/UIM coverage appeared in the selection/rejection form. We hold that Safeway was in compliance with the *Jordan* requirements.

{46}    Although not briefed, in oral argument before this Court, Ullman argued that the selection/rejection form was ambiguous with respect to the information in regard to the UM/UIM premium cost. Ullman asserted that only by adding language to the statement of the premium cost could the ambiguity be cleared up for legal adequacy. Thus, Ullman argued that the statement would have to read: "Based on your Bodily Injury Limit of: $25,000/50,000 the available UM/UIM Coverage option(s) for this policy are: $25,000/50,000 (per person/per occurance [sic]) with a total premium cost

32

of $52.00, or $0.29 per day," *on each vehicle for which you have selected UM/UIM coverage.*

{47} Further, Ullman argued that, because there existed language in the standard form policy that can be read to be an anti-stacking clause, an inconsistency or ambiguity existed as to whether Ullman could receive the full benefit of the UM/UIM offered in the selection/rejection form. We reject the contentions as a basis on which to reform Safeway's documents to require UM/UIM coverage and benefits.

**C.   Requirements: An Insurer Must Inform Its Insured of the Insured's Right to Reject the UM/UIM Coverage; An Insurer Must Obtain a Written Rejection; The Act of Rejection Must Assure That the Insured Is Sufficiently Informed of the Importance of the Decision, and There Is Clear Evidence of a Decision to Reject**

{48} The selection/rejection form states, "You have a right to purchase [UM/UIM] coverage in an amount up to your policy's liability limit, or you may reject the coverage entirely. The limit may not exceed your liability coverage limits. If you make no UM/UIM choices below, you will receive UM/UIM at the liability limits shown on your policy declarations." The selection/rejection form also contains language that permits the insured to reject UM/UIM coverage. *See Jordan*, 2010-NMSC-051, ¶ 21. That part states, "I wish to REJECT UM/UIM . . . Coverages entirely and understand that my policy will not contain these Coverages" and contains places in which an "X" is to be placed if the insured rejects coverages. Ullman's

33

completed form contains an "X" for rejection of UM/UIM coverage for each vehicle. *See Jordan*, 2010-NMSC-051, ¶ 22; *Marckstadt*, 2010-NMSC-001, ¶¶ 4, 21-26.

{49} Furthermore, the application and the declaration page show that Ullman rejected the coverage. And the selection/rejection form contains other options that show UM/UIM coverage that can be selected by the insured. The form states, "An 'X' indicates your current UM/UIM . . . selection(s)." The selection/rejection form contains a place for the insured's signature. Ullman signed the form, constituting a written *act* of rejecting the UM/UIM coverage. *See Jordan*, 2010-NMSC-051, ¶ 22; *Marckstadt*, 2010-NMSC-001, ¶ 21.

{50} Further, the selection/rejection form contains the bodily injury limits that the insured has chosen and matches that with the available UM/UIM coverage along with the "total premium cost . . . per vehicle." Ullman's form shows that, based on her chosen limits of "$25,000/50,000 the available UM/UIM coverage option for this policy" are "$25,000/50,000 (per person/per occurrence) with a total premium cost of $52.00, or $0.29 per day, per vehicle."

{51} In addition, the selection/rejection form contains at the outset the following informational material for the insured:

> New Mexico Law requires that all policies provide [UM/UIM] Coverage of at least $25,000 per person, $50,000 per accident . . . unless you specifically reject such coverage in writing. [UM] Coverage provides that if you suffer bodily injury or sickness including death, resulting

34

from an accident with a person who does not carry liability insurance, and that driver is at fault, you may make a claim against your own insurance company for general and special damages. [UIM] Coverage protects you from a driver who has insurance, but in an amount less than your [UM] Coverage.

{52} As well, the application specifically evidences rejection of UM/UIM coverage. Under Section 5 of this document, it states, "No coverage unless checked or premium shown." The document has space for bodily injury limits and premium, as well as limits and premiums for UM coverage, for each insured vehicle. Ullman signed the application. The form in Section 5 contains the bodily injury liability limits of $25,000/50,000, and the premium amount for that coverage for each insured vehicle, and shows "rejected" under the UM coverage for each. Above Ullman's signature, the application asks the insured to read certain matters set out in the application, two of which read in part:

I understand that I have only coverages indicated in Section 5. All of the coverages shown in Section 5 have been explained. I understand the various coverages and that I have only those coverage [sic] which have been completed. I have rejected all coverages not completed in Section 5. . . .

. . . .

I hereby acknowledge that I have received a completed copy of this application, the [UM/UIM] Coverage Selection/Rejection form, the policy, the declarations page and any endorsements, and I understand the coverage selections that I have made. I further understand that the entire policy contract includes this application, the policy, declarations page and any endorsements.

35

We hold that Safeway was in compliance with the aforementioned requirements.

**D.      Requirement: The Written Rejection Must Be Made a Part of the Policy By Endorsement on the Declarations Page; Attachment to the Policy or By Some Other Means That Makes the Rejection a Part of the Policy so as to *Clearly and Unambiguously* Call to the Attention of the Insured the Fact That Such Coverage Has Been Waived**

{53}      The document constituting the act of rejection need not be made a part of the policy, and it need not be attached to the policy. *See Marckstadt*, 2010-NMSC-001, ¶ 4. The insurer must "incorporate [the] rejection into the policy in a way that affords the insured a *fair opportunity* to reconsider the decision to reject[.]" *Jordan*, 2010-NMSC-051, ¶ 22 (emphasis added); *Romero*, 1990-NMSC-111, ¶ 8.

{54}      The application, under "Fraud Statement," states above the signature line:

> I hereby acknowledge that I have received a completed copy of this application, the [UM/UIM] Coverage Selection/Rejection form, the policy, the declarations page and any endorsements, and I understand the coverage selections that I have made. I further understand that the entire policy contract includes this application, the policy, declarations page and any endorsements.

Ullman signed this document.

{55}      The declaration page and the endorsement page each state "THE ENTIRE POLICY CONTRACT INCLUDES THIS DOCUMENT, THE APPLICATION, THE POLICY AND ANY ENDORSEMENTS." The endorsement page, which is virtually identical to the declaration page, states that it is "[a]ttached to and forming part of [the Ullman] policy." The policy states that its provisions "WITH THE

36

APPLICATION, DECLARATIONS PAGE AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THIS POLICY." We hold that Safeway complied with the aforementioned requirement.

## VIII. NO FACTUAL ISSUES EXIST

{56}     The district court did not deny Safeway's class summary judgment motion on the basis of the existence of genuine issues of material fact. The court instead ruled against Safeway on a controlling issue of law that the court certified to this Court—whether Safeway's uniform documentation complied with New Mexico law in obtaining waivers of UM/UIM coverage, including stacked coverage. The court determined that there existed a substantial ground for difference of opinion. Ullman's attempt to recharacterize issues of law into issues of fact fails on the merits and cannot overcome the legal nature of our inquiry. Indeed, Ullman's class definition reflects her primary contention, and she pursued that contention in the district court. Also noteworthy is Ullman's statement in a document that she filed following this Court's grant of Safeway's application for an interlocutory appeal in which Ullman stated that the "critical determination" was "whether Safeway's standard policy documents and UM/UIM forms comply with New Mexico law," and further, that "[t]he fact-specific circumstances surrounding any particular rejection are

immaterial." As well, in her answer brief, Ullman has not denied that she is seeking relief on the ground that Safeway's documents were legally inadequate.

## IX. THE STATUS OF CLASS ACTION CERTIFICATION

{57} Safeway sought summary judgment seeking to dismiss the class action on the ground that its uniform documents were valid and legal as to all class member-insureds. The district court determined that "there [was] at least one issue common to all persons affected dealing with the application of New Mexico law to the uniform policy language Safeway uses in insurance contracts with New Mexico residents." Commonality can exist when alleged legal deficiencies in uniform documents are common to the defined class. In considering predominance under Rule 1-023(B)(3) NMRA, the district court stated:

> Liability issues raised by this litigation are common to the class, and these common questions predominate over individual questions. The sole focus of the liability inquiry in this case is whether Safeway acted in accordance with its obligations pursuant to New Mexico law requiring insurers to obtain valid waivers of UM/UIM coverage, including stacked coverage. This question predominates over any other issue raised in this litigation. . . . All members of the class own standard Safeway automobile insurance policies in which the operative language is uniform.

{58} Thus, in certifying the class, the district court presumably determined that the class was appropriate because the documents were the same or essentially the same for all class-member insureds. Our determination in this appeal that the uniform

38

documents are legal and valid as a matter of law and in compliance with New Mexico law would appear to constitute a determination common to and predominating the class. Based on the foregoing, Safeway asks us to overturn the district court's certification of the class. We leave that issue for the district court on remand.

## X.    CONCLUSION

{59}    We hold that Safeway's forms complied with New Mexico law in all respects as to what is required for a valid rejection of UM/UIM coverage, including stacking. We reverse the district court's determination to the contrary and remand to the district court for whatever further proceedings may be required.

{60}    **IT IS SO ORDERED.**


_____
**JONATHAN B. SUTIN, Judge**


**WE CONCUR:**


_____
**JAMES J. WECHSLER, Judge**


_____
**J. MILES HANISEE, Judge**